2012 COA 94

Laura "Wendy" W. CHASE and Michael Sutak, Plaintiffs–Appellants,

v.

COLORADO OIL AND GAS CONSERVATION COMMISSION; Colorado State Board of Land Commissioners; and Magpie Operating, Inc., Defendants–Appellees.

No. 11CA1249.

Colorado Court of Appeals, Div. I.

June 7, 2012.

As Modified on Denial of Rehearing July 19, 2012.

Phillip D. Barber, PC, Phillip D. Barber, Denver, Colorado, for Plaintiffs–Appellants.

John W. Suthers, Attorney General, Jake Matter, Assistant Attorney General, Denver, Colorado, for Defendant–Appellee Colorado Oil and Gas Conservation Commission.

John W. Suthers, Attorney General, Casey A. Shpall, Deputy Attorney General, Ed Hamrick, First Assistant Attorney General, Heather A. Warren, Assistant Attorney General, Denver, Colorado, for Defendant–Appellee Colorado State Board of Land Commissioners.

Davis Graham & Stubbs LLP, John R. Jacus, Sam Niebrugge, Denver, Colorado, for Defendant–Appellee Magpie Operating, Inc.

Opinion by Judge FOX.

¶ 1 Plaintiffs, Laura W. "Wendy" Chase and Michael Sutak (collectively Landowners), appeal the district court judgment affirming orders of defendant the Colorado Oil and Gas Conservation Commission (COGCC): (1) declining to interpret the lease between defendants Magpie Operating, Inc. (Magpie) and the Colorado State Board of Land Commissioners (the Board); (2) denying Landowners' request to have their property deemed a Designated Outdoor Activity Area (DOAA); and (3) granting a permit to drill for natural gas to Magpie. We affirm in part, reverse in part, and remand for further findings by the COGCC.

## I. Background

### A. Nature and History of the Surface Estate

¶ 2 In 1997, Landowners purchased a seventy-seven-acre surface estate in Larimer County (the property or the surface estate) knowing it was subject to a mineral rights reservation. The 1916 patent transferring the surface estate (as part of a larger parcel) reserved to the state all mineral rights and "the right of ingress and egress for the purpose of mining together with enough of the surface of [the property] as may be necessary for the proper and convenient working of such minerals and substances." The Board owns the mineral estate and manages it for the benefit of the School Trust pursuant to Colorado Constitution, article IX, sections 9(6) and 10.

¶ 3 An irrigation ditch divides the property into two parcels. Landowners use part of the south parcel for agricultural purposes. The south parcel also contains a residence, agricultural outbuildings, and an indoor riding arena. Although the property is zoned for agricultural use, Landowners improved the property to facilitate its use as a training and competition area for equestrian events.

### B. The Mineral Estate and Gas Drilling Proposal

¶ 4 Since 1977, the Board has been a party to Oil and Gas Lease No. OG77/2130S (the lease) for production of oil and gas over a 640–acre section of land that includes the property. The lease was assigned many times, most recently to Magpie in 1998. The first attempt to access the mineral estate occurred in June 2008, when Magpie submitted two applications for permits to drill (APD) wells [1] on the property.

¶ 5 On November 21, 2007, before submitting its APDs, Magpie had contacted Landowners to solicit their input regarding the locations of the wells and other operations needed to facilitate gas drilling. After Magpie's representative and Landowners met in late 2007, Magpie sent a letter notifying Landowners of its intent to drill.

¶ 6 On December 7, 2007, the COGCC received Landowners' request for onsite inspection of the property to assist in identifying a gas drilling site.[2] After receiving the

---

1. The APDs were for the State–Chase 33–36 and State–Chase 34–36 wells.

2. After consultation with the lessee of the mineral rights, surface estate owners may request an onsite inspection by the COGCC when they have

request, COGCC staff participated in consultations between Landowners and Magpie concerning gas extraction activities. The COGCC inspected the property on August 27, 2008. The inspection was intended to determine whether an alternative drilling site could accommodate Landowners' concerns about the potential impact of drilling on their equestrian activities.[3]

¶ 7 After Magpie submitted the APDs, but before completion of COGCC's proposed survey, Landowners applied to have their surface estate declared a DOAA. A DOAA is defined as

¶ 8 a well-defined outside area (such as a playground, recreation area, outdoor theater, or other place of public assembly) that is occupied by twenty (20) or more persons on at least forty (40) days in any twelve (12) month period or by at least five hundred (500) or more people on at least three (3) days in any twelve (12) month period.

¶ 9 COGCC Rule 100 (Definitions). Magpie and the Board filed timely protests to the DOAA request.

¶ 10 The COGCC survey, completed on November 30, 2009, revealed that the alternative location for State–Chase 33–36 was outside the drilling window established by COGCC Rule 318A. Even so, a COGCC staff analysis recommended that the COGCC address Landowners' request for a DOAA, and, if the DOAA was denied, allow drilling on the alternative site.

¶ 11 The staff analysis noted that the authorization to drill on the alternative site, even though outside the drilling window, was consistent with Rule 318A.h., which "permits exception locations" as allowed under Rule 318.c. "for environmental or topographic reasons or other 'good cause.' " Only the mineral estate owner, not the surface estate owner,

needed to agree to the exception. The Board, as the mineral estate owner, approved the alternative well location on December 12, 2009.

¶ 12 The staff analysis also recommended the following conditions to approve the APDs for the State–Chase 33–36 and State–Chase 34–36 wells:

- "Drilling and completion activities shall occur between October 31 and March 1, outside of the irrigation season."
- "Interim reclamation shall commence immediately following well drilling and completion."
- "The operator shall implement all practicable measures to ensure that disruption to the surface owners' irrigation practices [is] minimized."
- "In addition to the required notice for site preparation, drilling and completion, the operator shall provide 30 days['] notice to the surface owner for any non-emergency workover or well treatment. If the surface owners fail to notify the operator of a scheduled event 14 days in advance of the scheduled work[,] then the operation may proceed. Otherwise[,] if [there] is a conflict then the operator shall work with the surface owner[s] to avoid the work during the surface owner[s'] scheduled equestrian events."

C. Landowners' DOAA Request

¶ 13 The COGCC held a hearing on Landowners' DOAA request on February 22, 2010. After the evidentiary hearing, COGCC commissioners expressed concern over several matters, including whether the number of people present on the property met the DOAA definition's requirements, whether the property was of the type anticipated to be protected under the rule, and whether waste would occur if Magpie's APDs were denied.

not executed an agreement regarding a proposed well to address any unresolved issues between the lessee and the surface estate owners. *See* COGCC Rules 305.b., 306. The relevant COGCC rules are codified at 2 Code Colo. Regs. 404–1.

**3.** The alternative drilling site was expected to remain within the Greater Wattenberg Area (GWA) drilling window, where the original drilling sites Magpie proposed were located. " 'Drilling window' means an area established by the

[COGCC] within which the surface location of a well or wells may be established. In the greater Wattenberg area, such drilling windows are referred to generally as the 'GWA window' and more specifically as the 'four-hundred-foot window' and the 'eight-hundred-foot window.' " § 24–65.5–102, C.R.S.2011; *see also* COGCC Rules 318, 318A (defining the GWA window and outlining the requirements for drilling).

### D. COGCC Decision on the DOAA Request

¶ 14 The COGCC ultimately denied Landowners' DOAA request. The COGCC's March 24, 2010, report concerning the DOAA hearing noted the testimony of the various witnesses, as well as the COGCC staff recommendation. The COGCC order stated:

> After deliberations, the Commission voted 6 to 3 to deny the Sutak–Chase application for a DOAA based on questions regarding the definition of "designated outside activity area," whether the property fell within the definition, whether it was the type of property or activity that was contemplated when ... the Commission [promulgated the definition], and whether waste will be committed because the wells cannot be located on the property if the [DOAA] application is granted.

The COGCC therefore ordered that (1) the DOAA request was denied; (2) the order was effective immediately; (3) the COGCC reserved its right to amend or repeal any or all of the order; (4) the order was final agency action for the purposes of judicial review pursuant to the Colorado Administrative Procedure Act (APA); and (5) no application for reconsideration was needed to seek judicial review.

### E. Magpie's Modified APD

¶ 15 After the hearing on the DOAA request, Magpie proposed a resolution to the conflict with Landowners whereby it would withdraw the APD for State–Chase 34–36 and ask for an exception to move State–Chase 33–36. Magpie asserted that COGCC Rule 318A authorized this exception, which would "achieve the desired mitigation of impacts" from its operations, while allowing for more cost-effective vertical drilling. Under the exception, Magpie would be able to access the well via a road along the eastern edge of the property and intersecting a county road. Finally, Magpie proposed locating a tank battery to serve the well at the far end of the access road.

¶ 16 Landowners responded to Magpie's proposal by (1) offering an alternative loca-

tion for the well, and (2) requesting certain accommodations, including that (a) a horse-safe access gate be installed that could be operated by Landowners and Magpie; (b) all gas flow lines run under the access road (without easements for the gas flow lines); (c) drilling and major work should be conducted between November 15 and March 1; (d) reclamation and reseeding should commence after well drilling; (e) Magpie should take all practicable measures to minimize disruption to Landowners' irrigation practices; (f) access to well sites should occur only before 8 a.m.; and (g) Magpie would give thirty days' notice before any site preparation and drilling.

¶ 17 The COGCC granted Magpie's APD for State–Chase 33–36 at the location suggested by Landowners. The COGCC also imposed many of Landowners' proposed conditions within the permit, including the Landowners' request to allow drilling only between November 15 and March 1, when equestrian training and events were not occurring (or were minimal).

### F. District Court Appeal

¶ 18 After the COGCC granted the APD for the State–Chase 33–36 well, Landowners appealed to the district court the denial of their DOAA request and the grant of Magpie's permit to drill pursuant to sections 24–4–106 and 34–60–111, C.R.S.2011; C.R.C.P. 106; and COGCC Rule 501.e. Landowners claimed that by refusing to interpret the lease, the COGCC failed to protect the public's health, safety, and welfare as required by the COGCC rules. Landowners also claimed that the COGCC abused its discretion, exceeded its jurisdiction, and acted arbitrarily and capriciously in denying their DOAA request because the evidence at the hearing established that the property qualified as a DOAA and the COGCC rewrote the DOAA rule without adequate notice. Finally, as to the APD, Landowners claimed that, because the property qualified for DOAA status, drilling activities were prohibited on the entire property.[4]

---

**4.** Alternatively, Landowners asserted that the original APD for State–Chase 33–36 identified a different location than was approved and did not seek to install surface equipment. Thus, Land-

¶ 19 The district court concluded that the COGCC did not have jurisdiction to interpret the lease, and that, because Landowners did not seek a declaratory judgment requesting that the court interpret the lease, the court lacked jurisdiction to interpret it. The district court also affirmed the COGCC's denial of the DOAA application and grant of the APD. Landowners now appeal the district court's judgment.

## II. Standard of Review

¶ 20 COGCC rules, regulations, or final orders are subject to judicial review in accordance with the APA. § 34–60–111 (citing § 24–4–106). Pursuant to the APA, a "reviewing court may overturn an administrative agency's determination only if the court finds the agency acted in an arbitrary and capricious manner, made a determination that is unsupported by the record, erroneously interpreted the law, or exceeded its constitutional or statutory authority." *Sapp v. El Paso County Dep't of Human Servs.*, 181 P.3d 1179, 1182 (Colo.App.2008) (citing § 24–4–106(7), C.R.S.2011).

¶ 21 "We examine the record in the light most favorable to the agency decision." *Sapp*, 181 P.3d at 1182 (citing *Alliance for Colorado's Families v. Gilbert*, 172 P.3d 964, 968 (Colo.App.2007)). Whether the record contains substantial evidence to support the agency's final decision is a question of law we review de novo.[5] *Zamarripa v. Q & T Food Stores, Inc.*, 929 P.2d 1332, 1343 (Colo.1997); *Colorado Real Estate Comm'n v. Bartlett*, 272 P.3d 1099, 1102 (Colo.App.2011); *Black Diamond Fund, LLP v. Joseph*, 211 P.3d 727, 730 (Colo.App.2009); *Lanes v. O'Brien*, 746 P.2d 1366, 1374 (Colo.App.1987) (when reviewing agency action under the APA, the court is limited to a consideration of the record made before that agency).

¶ 22 Moreover, in "construing an administrative regulation, we apply the same basic rules of construction as we would in the interpretation of a statute. Thus, we look first to the language of the rule and analyze the words and phrases according to their plain and ordinary meaning." *Williams v. Colorado Dep't of Corr.*, 926 P.2d 110, 112 (Colo.App.1996). This is consistent with COGCC Rule 100, which states that all words not otherwise defined but used in the COGCC rules "shall be given their usual customary and accepted meaning, and all words of a technical nature, or peculiar to the oil and gas industry, shall be given that meaning which is generally accepted in said oil and gas industry."

¶ 23 Generally, an agency's interpretation of its own rule is entitled to great deference. *Abromeit v. Denver Career Serv. Bd.*, 140 P.3d 44, 49 (Colo.App.2005) (citing *Halverstadt v. Department of Corr.*, 911 P.2d 654, 657 (Colo.App.1995)). We accept the agency's interpretation if it has a reasonable basis in law and is warranted by the record, but not if the rule clearly compels the contrary result. *Board of Cnty. Comm'rs v. Colorado Oil & Gas Conservation Comm'n*, 81 P.3d 1119, 1125 (Colo.App.2003) (citing *Ricci v. Davis*, 627 P.2d 1111, 1118 (Colo.1981)).

## III. Regulatory Framework: The Colorado Oil and Gas Conservation Act and the COGCC

¶ 24 Because the parties disagree on the extent of the COGCC's authority in denying, or modifying, the DOAA request, we address the source of the DOAA's authority.

¶ 25 Originally enacted in 1951, Colorado's Oil and Gas Conservation Act (Conservation Act), §§ 34–60–101 to –128, C.R.S.2011, established the COGCC[6] to provide for the

---

owners argued, Magpie did not comply with the rules applicable to new wells and the COGCC should have denied the APD. Because we are remanding, we need not address this issue.

**5.** "Substantial evidence is the quantum of probative evidence that a fact finder would accept as adequate to support a conclusion, without regard to the existence of conflicting evidence." *Black Diamond Fund, LLP v. Joseph*, 211 P.3d 727, 730 (Colo.App.2009) (citing *Westmark Asset Mgmt.*

*Corp. v. Joseph*, 37 P.3d 516, 520 (Colo.App. 2001)); *accord Ward v. Department of Natural Resources*, 216 P.3d 84, 94 (Colo.App.2008).

**6.** The COGCC is the successor entity to the Gas Conservation Commission, created in 1927 after the 1915 enactment of oil and gas conservation laws. *Union Pacific R.R. Co. v. Oil & Gas Conservation Comm'n*, 131 Colo. 528, 537, 284 P.2d 242, 247–48 (1955); *see also* Angela Neese, *The Battle Between the Colorado Oil and Gas Conser-*

responsible development of the state's oil and gas resources. In analyzing the COGCC's decision in this case, it is useful to review the powers of the COGCC; the Conservation Act amendments requiring that the COGCC protect the public's health, safety, and welfare; and the COGCC's implementing rules.

## A. The COGCC's Powers and Focus

¶ 26 The COGCC originally focused on increasing productivity of oil and gas resources. § 34–60–102(1), C.R.S.2011. As a creature of state statute, the COGCC has powers conferred by that statute. *See Hawes v. Colorado Div. of Ins.*, 65 P.3d 1008, 1016 (Colo.2003) (agencies must act only within the scope of their delegated authority); *Denver Local 2–477 v. Metro Wastewater Reclamation Dist.*, 7 P.3d 1042, 1046 (Colo.App.1999) (duties and powers of agencies are determined and limited by the statutes that created them). The Conservation Act broadly empowers the COGCC "to make and enforce rules, regulations, and orders" and "to do whatever may reasonably be necessary" to carry out the provisions of the Conservation Act.[7] § 34–60–105(1), C.R.S. 2011.

¶ 27 The COGCC has the authority, pursuant to the Conservation Act, to regulate the drilling, producing, and plugging of wells, as well as all other operations necessary for the production of oil or gas. § 34–60–106(2)(a), C.R.S.2011. Significantly, the Conservation Act states that the grant of any specific power or authority to the COGCC shall not be construed to be in derogation of any other general powers and authority granted. § 34–60–106(4), C.R.S.2011.

¶ 28 The 1994 amendments to the Conservation Act enlarged the COGCC's focus from promoting oil and gas production to include consideration of environmental impact and public health, safety, and welfare.[8] § 34–60–102, C.R.S.2011; *see also* Ch. 317, sec. 2, § 34–60–102, 1994 Colo. Sess. Laws 1978. Consistent with its expanded charge of protecting public safety, the COGCC has adopted and applies various rules [9] and permit conditions, including safety setbacks from dwellings for wells and production equipment; blowout prevention equipment requirements; well and equipment safety specification and design standards; requirements for security fencing in high density areas; and special operations safety procedures. *See* Neese, *The Battle*, 76 U. Colo. L.Rev. at 578.

## B. COGCC's Rules

¶ 29 The COGCC's rules protect the health, safety, and welfare of the general public during the drilling, completion, and operation of oil and gas wells and producing facilities. *See generally* COGCC Rules; *see also* § 34–60–106(10)–(12), C.R.S.2011. COGCC Rule 603—titled "Drilling and Well

---

vation *Commission and Local Governments: A Call for a New and Comprehensive Approach*, 76 U. Colo. L.Rev. 561, 562 (2005). Effective July 1, 2007, the COGCC has nine members: the executive directors of the Department of Natural Resources and the Department of Public Health and Environment, and seven members who are appointed by the governor. § 34–60–104(2)(a)(I), C.R.S.2011. Three of the members must be experienced in the oil and gas industry, and at least two of these three members must have a college degree in petroleum geology or petroleum engineering. *Id.* The characteristics of the remaining members are specified in the statute. *Id.*

7. Parts of section 34–60–106, C.R.S.2011, were modified by H.B. 07–1341 effective May 29, 2007.

8. The COGCC's purpose now includes fostering "the responsible, balanced development, production, and utilization of the natural resources of oil and gas in the state of Colorado in a manner consistent with protection of public health, safe-

ty, and welfare." § 34–60–102(1)(a)(I), C.R.S. 2011.

9. The COGCC was required to promulgate rules by April 1, 2008, to (1) establish a timely and efficient procedure to review applications for a permit to drill and applications for an order establishing or amending a drilling and spacing unit; and (2) protect the health, safety, and welfare of the general public in the conduct of oil and gas operations. § 34–60–106(11), C.R.S. 2011. After an extensive rulemaking process—which unofficially began in the fall of 2007 and included many public meetings and hearings, comments from stakeholders, and deliberations—the COGCC adopted new rules and amendments in December 2008. *See* Statement of Basis, Specific Statutory Authority, and Purpose: New Rules and Amendments to Current Rules of the Colorado Oil and Gas Conservation Commission, 2 Code Colo. Regs. 404–1.

Servicing Operations and High Density Area Rules"—addresses setbacks for drilling and other well-servicing equipment, especially where that equipment is proposed to be placed near a DOAA (or near a high density area (HDA)). The rule works in tandem with Rules 100, 318, and 318A.

¶ 30 Rule 603 empowers the COGCC to determine the appropriate boundaries and setbacks when a property qualifies as a DOAA or as a high density area. Rule 603, in addition to addressing other safety concerns, establishes minimum setbacks (or distances) from occupied buildings, public roads, above-ground utility lines, railroads, and surface property lines. COGCC Rule 603.a. Larger setbacks are necessary for wellheads and production equipment located within a DOAA or an HDA. COGCC Rule 603.b.-d. Failure to comply with the COGCC's consultation or setback requirements can lead to denial of an APD. *See* Phillip D. Barber, 1B Colo. Methods of Practice § 14:9 (6th ed. 2010).

¶ 31 Rule 318 identifies the operative setbacks from lease lines where a gas well location is proposed. The setback locations generally depend on the depth of the well,[10] unless the operator or surface owner requests an exception or a variance—often in the form of an alternative location—for the proposed well. The COGCC retains discretion to grant or deny the exception or variance:

> The Director *may grant* an operator's request for a well location *exception* to the requirements of this rule or any order because of geologic, environmental, topographic or archaeological conditions, irregular sections, a surface owner request, or for other good cause shown.... [T]he operator may apply for a *variance* under Rule 502.b. If a party or parties object to a location and cannot reach an agreement,

the operator may apply for a Commission hearing on the *exception* location.

COGCC Rule 318.c. (emphasis added).

¶ 32 Generally, unless the COGCC grants a variance or waiver, wellheads or production operations must be located 150 feet from a building, public road, major above-ground utility line, or railroad. COGCC Rule 603. a. (1). With some exceptions[11] and variances, the rules increase the presumptive setback distance for wellheads, and even more for other production equipment, proposed to be placed near an HAD, non-enclosed DOAA, or developments. COGCC Rule 603.b., e. The rules generally promote safety, but also grant the COGCC significant discretion to allow exceptions or variances, as appropriate.

## IV. Interpretation of the Lease

¶ 33 Landowners first contend that the COGCC erred in granting Magpie a permit to drill because the lease between Magpie and the Board prohibits Magpie from conducting exploration or drilling operations within 200 feet of any improvement on the property without Landowners' consent. Landowners assert that the COGCC erroneously determined that it lacked jurisdiction to interpret the lease. Landowners maintain that the COGCC has the implied power to interpret leases in order to carry out the provisions of its enabling statute, pursuant to section 34–60–105. We are not persuaded.

¶ 34 "[A]n agency's determination of its own jurisdiction is subject to de novo review by a court." *Hawes,* 65 P.3d at 1015 (citing § 24–4–106(7)); *see also Colorado State Personnel Bd. v. Department of Corr.,* 988 P.2d 1147, 1151 (Colo.1999) (deference is given to an agency's reasonable interpretation of its statute when it "lighten[s] the agency's workload and mak[es] its decisionmaking process more efficient" as long as it is consistent with the intent and purpose of the statute); *Grynberg v. Colorado Oil &*

---

**10.** COGCC Rule 318.a.-b.; *see also* COGCC Rule 318A.h (cross-referencing Rule 318.c.).

**11.** Rule 603.e.(6) provides: *"Exceptions* to the location requirements set out in (2) and (3) above shall be granted by the Director if the Director determines that Rule 318 has been complied with and that a copy of waivers from each person

owning a building unit or building permitted for construction within three hundred fifty (350) feet of the proposed oil and gas location is submitted as part of the Form 2, and that the proposed location complies with all other safety requirements of the rules and regulations." (Emphasis added.)

*Gas Conservation Comm'n,* 7 P.3d 1060, 1063 (Colo.App.1999) (concluding that the COGCC lacks jurisdiction to interpret a royalty agreement under section 34–60–118.5, C.R.S. 2011).

¶ 35 The COGCC's Statement of Basis explains the extent of its jurisdiction: "[T]he Commission ... has the authority to remedy only issues that are within its jurisdiction. The Commission cannot, for example, remedy issues related to the interpretation or enforcement of ... contracts between surface owners and operators governing surface use...." Although Landowners assert that, pursuant to section 34–60–105, the COGCC's express or implied powers necessarily include interpreting a lease, they do not identify any specific provision allowing the COGCC to interpret contracts.

¶ 36 Given the ambiguity of section 34–60–105,[12] we conclude the COGCC's determination that it lacked jurisdiction to interpret the contract was reasonable. *See Grynberg,* 7 P.3d at 1062–63 (when a statute is unclear or ambiguous as to the extent of the powers granted to the agency, we defer to the agency's interpretation, provided it is reasonable).

¶ 37 Finally, although a district court may issue declaratory relief, as Landowners assert, their complaint never requested such a declaration.[13] Thus, the issue concerning interpretation of the lease is not properly before us. *Ferguson Enterprises, Inc. v. Keybuild Solutions, Inc.,* 275 P.3d 741, 750 (Colo. App.2011) (citing *Brown v. Silvern,* 141 P.3d 871, 874 (Colo.App.2005)).

## V. Landowners' DOAA Request

¶ 38 Landowners next contend that the COGCC erred in denying their DOAA request because the COGCC failed to apply the clear and unambiguous requirements of the DOAA rule. Landowners assert that the DOAA rule clearly provides that the subject area be occupied by at least twenty people for forty days or more, but does not require that all the occupants be present at any one time. Thus, Landowners argue that their property met the requirements, and that the COGCC was obligated to grant their DOAA application.

¶ 39 We agree with Landowners that the occupants need not be present at the same time, but we also conclude the COGCC failed to make the necessary factual findings concerning the DOAA request. Accordingly, we remand for detailed findings on whether the property meets the criteria of a DOAA under the COGCC rules.

### A. COGCC Discretion

¶ 40 Landowners applied to have the entire seventy-seven acres declared a DOAA, but nothing in the rules requires that the COGCC grant DOAA status to the entire area identified in a DOAA request. *See generally* COGCC Rules. The rules give the COGCC discretion to grant variances and exceptions from its own guidelines.

¶ 41 The record discloses that only one other area was previously declared a DOAA. In that case, the City of Longmont applied to have approximately 400 acres, planned as a city outdoor recreational area, established as a DOAA. However, only forty acres were declared a DOAA. The COGCC determined the remaining area did not constitute a DOAA because "plans [had] not yet moved beyond the planning stage of these facilities and because these facilities [were] not yet under construction or in use by the public as of the date of the hearing," despite the estimated 244,000 visitors expected to use the facilities annually once development was completed.

¶ 42 Similarly, here, if any portion of the property is granted DOAA status, the COGCC retains discretion to limit the size of the requested DOAA as appropriate. COGCC Rule 603.d. (COGCC *shall* determine the appropriate boundary and setbacks for a DOAA); *see also* COGCC Rule 318.c.

---

12. The Conservation Act broadly empowers the COGCC "to make and enforce rules, regulations, and orders" and "to do whatever may reasonably be necessary to carry out the provisions of" the Conservation Act. § 34–60–105.

13. As noted in oral argument, Magpie and Landowners are currently involved in litigation (Larimer County District Court No. 09CV 1134) raising the proper interpretation of the lease.

(allowing COGCC to grant variances and exceptions).

### 1. Occupancy by Twenty People

[4] ¶ 43 We conclude that twenty persons need not be present on the property *at the same time* in order to meet the definition of a DOAA.

¶ 44 During the DOAA hearing, the COGCC commissioners disagreed about whether "occupied" meant that all twenty persons needed to be present at one time or over the course of the day in smaller groups. One commissioner noted that there were problems with the definition of DOAA because the definition did not address "density" and that there was no requirement that twenty people be present at one time. Another noted that the accuracy of the attendance numbers presented by Landowners was in question.

¶ 45 The commissioners' deliberations thus evidence the ambiguity of the DOAA definition. *See Grant v. People*, 48 P.3d 543, 547–48 (Colo.2002) (where there are multiple interpretations of a phrase, the statute's language is ambiguous); *Walter G. Burkey Trust v. City & Cnty. of Denver*, 2012 COA 20, ¶¶ 8–12, 284 P.3d 158 (where both parties' interpretations of a zoning ordinance are reasonable, the ordinance is ambiguous); *Sierra Club v. Billingsley*, 166 P.3d 309, 312 (Colo. App.2007) (where zoning provisions are susceptible of more than one reasonable interpretation, they are ambiguous). Thus, we address that ambiguity here.

¶ 46 We have found no specialized meaning in the oil and gas industry for the term "occupy," and the parties have cited to none. Thus, we first give the term "occupy" its "usual customary and accepted meaning." COGCC Rule 100. A common dictionary definition of "occupy" is "to fill up (a place or

extent)." *Webster's Third New International Dictionary* 1561 (2002); *see Cerbo v. Protect Colo. Jobs, Inc.*, 240 P.3d 495, 501 n. 4 (Colo.App.2010) (when a statute does not define a term of common usage, we may refer to dictionary definitions to determine its plain meaning); *see also Tidwell v. City & Cnty. of Denver*, 83 P.3d 75, 82 (Colo.2003). However, this guidance is only marginally useful, and we look to other sources to determine how to apply the term.

¶ 47 Examples in the DOAA definition include "playground, recreation area, outdoor theater, or other place of public assembly," and these examples do not clearly indicate that twenty people must be in an area at one time to meet the occupancy requirement.[14] Indeed, at a playground, there is no guarantee that twenty people would be present at the same time for forty days in a year.

¶ 48 The way the term "occupied" is used in other parts of the COGCC rules also supports our conclusion that it is not necessary that all twenty people be present on the property at one time. Rule 604.b.(5), for example, requires that fired vessels, including heater-treaters "shall be a minimum of two hundred (200) feet from residences, building units, or well defined normally occupied outside areas." Rule 604.c.(1) requires all wells within 150 feet from "normally occupied building units, or well defined normally occupied outside area(s)" be equipped with automatic control valves. Finally, pursuant to Rule 802.c.(1), sound levels for noise abatement complaints shall be measured twenty feet from a structure if an oil and gas facility "is installed closer than three hundred fifty (350) feet from an existing occupied structure." It would be inconsistent to read the term "occupied" as requiring all twenty people to be present at one time when other parts of the COGCC Rules contain no such requirement. *See Cendant*

---

14. The 2008 public hearings on amendments to the COGCC's rule also indicate there was some confusion on the requirements of the number of people that needed to be present in order to designate an area a DOAA. The concern was that there was no structure from which to measure the setback for certain outside activities. As witness noted, "One of the concerns is that we often get large groups of people where there isn't necessarily a building involved ... There [is no] magic in the numbers. [T]he rules are certainly negotiable in terms of how frequent these things would have to occur, how many numbers of people have to be involved, or how we define the boundaries. [W]e saw the problems as being more than just traditional structures ... *there were activities that warranted protection* beyond the structures." (Emphasis added.) The definition of DOAA was not amended after these hearings.

*Corp. v. Department of Revenue*, 226 P.3d 1102, 1106 (Colo.App.2009) (appellate court must read and consider the statutory and regulatory scheme as a whole to give consistent, harmonious, and sensible effect to all its parts).

¶ 49 We therefore agree with Landowners that twenty persons need not be present on the property *at the same time* in order to meet the definition of a DOAA.

### 2. COGCC Consideration of the Purpose of the DOAA and of Waste

¶ 50 Landowners also contend that, in evaluating their DOAA request, the COGCC improperly considered whether the property met the purposes of the DOAA designation and whether waste [15] would occur if all or part of the property was declared a DOAA. We disagree.

¶ 51 The COGCC commissioners mentioned waste at the hearing, but the final order included no findings regarding waste or the purpose of the DOAA. Therefore, we cannot determine how, or even if, the commissioners considered those matters or if the COGCC abused its discretion in denying the DOAA request.

¶ 52 However, the DOAA definition does not preclude the COGCC from considering factors other than occupancy in determining whether land should be designated as a DOAA. *Cendant Corp.*, 226 P.3d at 1106.

¶ 53 The Conservation Act declares that it is in the public interest to "[p]rotect the public and private interests against waste in the production and utilization of oil and gas." § 34-60-102(1)(a)(II), C.R.S.2011. The Act thus supports our conclusion that it is appropriate for the COGCC to consider various factors,[16] including waste, in determining if an area should be deemed a DOAA. *See* § 34-60-102(1)(a)(I), C.R.S.2011 (it is in the public interest to protect against waste in the production and utilization of oil and gas); § 34-60-105(1) (the COGCC "has jurisdiction ... necessary to enforce the provisions of this article, ... and has the power to make and enforce rules, regulations, and orders pursuant to this article, and to do whatever may reasonably be necessary to carry out the provisions of this article").

¶ 54 We thus reject Landowners' contention that the COGCC could not have considered minimizing waste and the purposes of the DOAA in the context of the COGCC's statutory mandate and in the context of the Board's constitutional or statutory duties.

### B. Inadequate Findings

¶ 55 In evaluating Landowners' DOAA request and Magpie's APD, it is apparent that the COGCC endeavored to carry out its responsibilities while attempting to balance the rights and obligations of Landowners, the Board, and Magpie.[17] However,

---

15. Waste is defined as "the escape, blowing, or releasing, directly or indirectly into the open air, of gas from wells productive of gas only, or gas in an excessive or unreasonable amount from wells producing oil, or both oil and gas; and the production of gas in quantities or in such manner as unreasonably reduces reservoir pressure or unreasonably diminishes the quantity of oil or gas that ultimately may be produced; excepting gas that is reasonably necessary in the drilling, completing, testing, and in furnishing power for the production of wells." § 34-60-103(11), C.R.S.2011. Waste Also is defined as "[p]hysical waste, as that term is generally understood in the oil and gas industry." § 34-60-103(13)(a), C.R.S. 2011.

16. One of those factors is safety. The setbacks for a DOAA are found in COGCC Rule 603.d., which is in the part of the rules entitled "Safety Regulations." The 600–Series rules were "promulgated to protect the health, safety and welfare of the general public" during drilling operations. COGCC Rule 601.

17. Mineral estate owners have an implied easement, which burdens the surface interest and empowers mineral owners to make reasonable use of the surface in order to access the minerals below. *See Roaring Fork Club, L.P. v. St. Jude's Co.*, 36 P.3d 1229, 1235 (Colo.2001) (both the holder of the easement and the owner of the land have rights to use the property and those interests must be balanced); *see also Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 926 (Colo. 1997) (recognizing that the mineral estate owner, or his lessee, is privileged to access the surface and use the portion of the surface reasonably necessary to develop the mineral interest). As relevant to these parties, mineral rights, including access rights, were retained to facilitate the Board's duty to "manage, control, and dispose of such lands in accordance with the purposes for which said grants of land were made and section 10 of this article IX" of the Colorado Constitution. Colo. Const. art. IX, § 9(6). The Board has a duty prudently to manage state assets consistently with its trustee obligations and "to pro-

the COGCC order does not contain sufficient factual findings explaining why the COGCC denied the DOAA to allow us to meaningfully review the basis for the COGCC's denial. *See, e.g., FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 513, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009) (an agency must "examine the relevant data and articulate a satisfactory explanation for its action") (quoting *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)); *Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1575 (10th Cir.1994) ("If the agency has failed to provide a reasoned explanation for its action, or if limitations in the administrative record make it impossible to conclude the action was the product of reasoned decisionmaking, the reviewing court may supplement the record or remand the case to the agency for further proceedings."); *People v. McIntyre,* 789 P.2d 1108, 1110 (Colo.1990) (a trial court must make sufficiently clear and detailed findings of fact and conclusions of law to permit meaningful appellate review).

¶ 56 For example, the COGCC's order does not state whether the DOAA definition was satisfied, and if it was not satisfied, what components of the definition were not met. The commissioners' deliberations also indicate some confusion about how many people were on what part of the property over what period of time. § 24–4–106(6), C.R.S.2011 (the record shall include rulings, the decision, findings, and action of the agency); § 24–4–106(7) (reviewing court must look at the "whole record" in determining if the agency abused its discretion in making its decision); *see Colonial Bank v. Colorado Fin. Servs. Bd.,* 961 P.2d 579, 587–88 (Colo.App.1998) (on APA review, the court looked at the deliberations as part of the record).

¶ 57 Some commissioners had concerns regarding inconsistencies in the records that Landowners provided to prove the numerical components of a DOAA.[18] However, the COGCC's order does not state what credibili-

ty determinations, if any, the COGCC made. *See Davison v. Industrial Claim Appeals Office,* 84 P.3d 1023, 1029 (Colo.2004) (appellate court defers to agency's determination of facts); *Bartlett,* 272 P.3d at 1102 (appellate court defers to the agency's credibility determinations of witnesses).

¶ 58 In denying Landowners' application, the written order noted that the COGCC's denial was based, in part, "on questions regarding the definition of 'designated outside activity area.'" The commissioners' confusion and disagreement over the DOAA definition's requirement for the number of people that had to be present was not clearly addressed in the COGCC order. The commissioners' order makes no finding as to which number requirement (twenty people all at the same time or twenty people over the course of the day) they applied to the evidence presented. It is unclear which requirement the commissioners used in determining that the property did not meet the DOAA definition. Accordingly, we are not in a position to defer to the COGCC's interpretation, as no interpretation was selected.

¶ 59 In summary, we lack an order with sufficiently detailed findings of facts, including assessments of the evidence and testimony, and conclusions of law—in particular regarding the number requirement in the DOAA definition—to allow meaningful review on appeal. *McIntyre,* 789 P.2d at 1110; *see also Freedom Colo. Info., Inc. v. El Paso Cnty. Sheriff's Dep't,* 196 P.3d 892, 903 (Colo. 2008) ("Judicial review of agency action typically requires court examination of the basis for the agency's final determination to assure that the action was justified under applicable legal standards.") (citing *Forbes v. Poudre Sch. Dist. R–1,* 791 P.2d 675, 680 (Colo.1990), and *Board of Cnty. Comm'rs v. Isaac,* 18 F.3d 1492, 1497 (10th Cir.1994) (noting that "an agency must articulate the grounds for its decision with enough detail to enable the reviewing court to determine whether the

---

duce reasonable and consistent income over time." *See* Colo. Const. art. IX, § 10(1). The COGCC had to consider the constitutional and legislative constraints and powers of the Board, a party to this case.

18. At the hearing, some commissioners noted that the evidence revealed discrepancies in the reporting of how many people were present on the property on specific days. But the COGCC's order did not make factual determinations or credibility assessments for this court to review.

agency considered the relevant factors and made a reasonable choice")). Accordingly, we remand the case to the district court with instructions to remand to the COGCC for additional findings based on the current record, consistent with the views expressed in this opinion.

## VI.  Permit to Drill

¶ 60 Landowners also argue that the COGCC erred in granting Magpie a permit to drill. However, this argument relies on Landowners' assertion that the property qualified as a DOAA and was subject to the mandatory setback requirements in Rule 603.d. Given our conclusion that a remand is necessary to determine whether Landowners are entitled to a DOAA, we do not address this issue.

## VII.  Conclusion

¶ 61 The district court's judgment is affirmed as to the COGCC's and the district court's refusal to interpret the lease. The judgment is reversed as to the COGCC's denial of Landowners' DOAA designation and the case is remanded for detailed findings by the COGCC, based on the existing record, consistent with this opinion. The judgment also is reversed as to Magpie's APD to the extent it depends on the outcome of the COGCC's DOAA decision on remand.

Judge TAUBMAN and Judge ROTHENBERG * concur.