24CA1228 Peak Neurology v Hesselbrock 07-03-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA1228
El Paso County District Court No. 23CV31441
Honorable David A. Gilbert, Judge

Peak Neurology, PC, a Colorado corporation,

Plaintiff-Appellee and Cross-Appellant,

v.

Diane Hesselbrock, M.D.,

Defendant-Appellant and Cross-Appellee,

v.

Brad Priebe, D.O.,

Third-Party Defendant-Appellee.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division VII
Opinion by JUDGE LUM
Lipinsky and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 3, 2025

First & Fourteenth, PLLC, Edward A. Gleason, Julian R. Ellis, Jr., Colorado
Springs, Colorado, for Plaintiff-Appellee and Cross-Appellant and Third-Party
Defendant-Appellee

Sears & Associates, P.C., Hollie L. Wieland, Colorado Springs, Colorado, for
Defendant-Appellant and Cross-Appellee

¶ 1     This matter involves the termination of defendant, Diane Hesselbrock, M.D., from her position as a physician with plaintiff, Peak Neurology, PC (PN). Dr. Hesselbrock appeals the district court's ruling that she was not an employee of PN for purposes of the Colorado Wage Claim Act (CWCA), section 8-4-101(5), C.R.S. 2024, and, therefore, that she wasn't entitled to statutory penalties and attorney fees under sections 8-4-109 and -110, C.R.S. 2024. PN and third-party defendant, Brad Priebe, D.O., cross-appeal the district court's interpretation of Dr. Hesselbrock's employment agreement with PN and its ruling that the agreement's liquidated damages provision is unenforceable. We affirm in part, reverse in part, and remand for further proceedings.

## I.    Background

¶ 2     Dr. Priebe is the sole shareholder of PN, a neurology practice. In 2019, Dr. Hesselbrock joined PN and entered into an "Associate Physician Employment Agreement" (Agreement) with PN. The Agreement sets out the terms of Dr. Hesselbrock's work with PN and contains a production-based compensation scheme. The Agreement also states that Dr. Hesselbrock would owe PN

1

liquidated damages if she began practicing neurology within a thirty-mile radius of PN within one year of leaving the practice.

¶ 3        Dr. Hesselbrock gave PN a termination notice in November 2022.  Her last day at PN (termination date) was January 31, 2023.[1] In June 2023, Dr. Hesselbrock began treating patients at UC Health Neurology, which is located within a thirty-mile radius of PN.

¶ 4        Shortly thereafter, the parties became embroiled in a disagreement about the final amount of compensation owed to Dr. Hesselbrock under the Agreement.  PN filed the underlying action for breach of contract and declaratory judgment, asserting that Dr. Hesselbrock owed PN (1) compensation she had received in excess of the amount to which she was entitled under the Agreement and (2) liquidated damages as a result of her termination and competition.  Dr. Hesselbrock counterclaimed and added Dr. Priebe as a third-party defendant, asserting that (1) PN breached the Agreement; (2) PN and Dr. Priebe unlawfully withheld wages from

---

[1] Under Section 6.5 of the Agreement, a physician may terminate it without cause by providing a ninety-day written notice to PN. During the ninety-day period, the physician is expected to complete their duties as usual.  Dr. Hesselbrock left PN fewer than ninety days after she gave notice, but PN didn't assert a separate breach of contract claim based on a notice period violation.

her in violation of the CWCA; and (3) PN and Dr. Priebe retaliated against and constructively discharged her (further CWCA violations) after she raised wage concerns.

¶ 5 The district court conducted a two-day bench trial and made three rulings relevant here:

- Dr. Hesselbrock wasn't an "employee" under the CWCA.

- The Agreement entitled Dr. Hesselbrock to payment for receivables related to work she had performed before her termination date but that weren't collected until after her termination date. (The district court made this ruling pretrial.)

- The Agreement's liquidated damages provision was unenforceable.

¶ 6 Dr. Hesselbrock appeals the first ruling, and PN and Dr. Priebe cross-appeal the other two rulings.

## II. Dr. Hesselbrock's Employee Status

¶ 7 Dr. Hesselbrock contends that the court erred by concluding she wasn't an employee of PN under the CWCA. We conclude that additional findings are necessary.

## A.    Applicable Law and Standard of Review

¶ 8    The CWCA defines an "employee" as "any person . . . performing labor or services for the benefit of an employer."  § 8-4-101(5).  However, the statute contains an exception:

> [A]n individual primarily free from control and direction in the performance of the service, both under his or her contract for the performance of service and in fact, and who is customarily engaged in an independent trade, occupation, profession, or business related to the service performed is not an "employee."

*Id.*  For purposes of this opinion, we will refer to individuals falling under this statutory exception as "independent contractors."

¶ 9    When evaluating whether a worker is "primarily free from control and direction," both under the contract and in fact, courts examine contract provisions pertaining to the worker's duties and compensation, as well as the nature of the worker's relationship with the putative employer.  *See Bermel v. BlueRadios, Inc.*, 2017 COA 20, ¶¶ 36-38, *aff'd on other grounds*, 2019 CO 31.

¶ 10   When evaluating whether a worker is "customarily engaged in an independent trade, occupation, profession, or business," courts examine (1) whether the worker is free to provide services to other entities during the time she works for the employer; (2) whether the

worker is paid a salary instead of a fixed contract rate; (3) whether the employer provides training, tools, benefits, materials, or equipment to the worker; (4) whether the employer establishes the time during which the worker is supposed to perform her duties; (5) whether the employer can terminate the contract for reasons other than breach or unsatisfactory work; (6) whether the employer pays the worker personally or makes payment to the name of the worker's trade or business; and (7) any other relevant factor. *See Indus. Claim Appeals Off. v. Softrock Geological Servs., Inc.*, 2014 CO 30, ¶¶ 1, 15-16 (listing factors for determining whether a worker is "engaged in an independent trade, occupation, profession, or business" under the Colorado Employment Security Act); *see also Bermel*, ¶¶ 37-38 (reversing a summary judgment ruling that a worker was an independent contractor because contractual terms established that (1) the worker was expected to "devote full time, attention, and energies to the [employer's] business"; (2) the worker was prohibited from "engag[ing] in any other related business activity of" the employer during the contract; (3) the worker was prohibited from competing with the employer for two years after the conclusion of the contract; (4) the employer retained the right to

reasonably modify the worker's duties at its discretion; and (5) the employer contracted to pay the worker at an hourly rate "payable at regular payroll periods every" two weeks).

¶ 11 Generally, whether a person is an employee or an independent contractor is a question of fact. *See Frank C. Klein & Co. v. Colo. Comp. Ins. Auth.*, 859 P.2d 323, 328 (Colo. App. 1993); *see also Softrock*, ¶ 2 (noting that whether an individual is "customarily engaged in an independent trade, occupation, profession, or business" is a question of fact). We defer to a district court's findings of fact as long as they are supported by the record. *People v. Thomas*, 853 P.2d 1147, 1149 (Colo. 1993). However, we may reverse if the district court makes insufficient factual findings, such as assessments of the evidence and testimony, to facilitate meaningful appellate review. *Chase v. Colo. Oil & Gas Conservation Comm'n*, 2012 COA 94, ¶¶ 55, 59.

## B. Analysis

¶ 12 The district court first noted that the Agreement's repeated use of the term "employee" wasn't determinative of Dr. Hesselbrock's status. It then concluded that Dr. Hesselbrock wasn't an employee because "the Agreement makes clear" that Dr. Hesselbrock (1) had

6

"individual responsibility for patient care, maintaining professional education credentials, development, and ethics"; and (2) could decide when to schedule her own time off "with consultation with colleagues and front desk staff to maintain continuity of patient care." Finally, the court concluded, "[t]he fact that PN, through Dr. Priebe, has control over the establishment of general policy, bookkeeping, hiring and firing, and other business matters does not alter the traditional role of [Dr. Hesselbrock], a physician involved in the practice of medicine with PN."

¶ 13     We agree that the Agreement's use of the term "employee" isn't dispositive of Dr. Hesselbrock's relationship with PN. However, to the extent that the district court based its decision about freedom from control solely on the general notion that each physician must exercise her own clinical judgment in rendering patient care, it erred. This reasoning would exclude all (or nearly all) physicians from the definition of "employee" just by the nature of their profession. § 8-4-101(5). No statutory language supports such an interpretation.

¶ 14     To the extent that the district court based its decision on something other than the "traditional role" of a physician, the

remainder of the court's findings are too scant for us to conduct meaningful appellate review. *See Chase*, ¶¶ 57, 59.

¶ 15     First, while the district court said that the Agreement made Dr. Hesselbrock's independence "clear," it's not clear to us why the court believed that to be the case. For example, one provision of the Agreement says that Dr. Hesselbrock "shall perform the usual and customary duties of a physician in the Practice of Medicine [and] shall render such services *in such manner and at such times as are reasonably determined by [PN's] Medical Director.*" (Emphasis added.) This provision seems inconsistent with the court's conclusion that Dr. Hesselbrock was free from control in her responsibility for patient care, and we can't tell on which provision of the Agreement — or on what testimony — the district court relied to reach its conclusion.

¶ 16     Second, we can't tell from the findings why the district court concluded that Dr. Hesselbrock was "customarily engaged in an independent trade, occupation, profession, or business." *Cf. Bermel*, ¶¶ 35-36 (noting that employer's evidence only established freedom from control in fact and not freedom from control under the contract or engagement in independent trade). For example, the

district court made no findings about (1) the manner in which Dr. Hesselbrock was compensated; (2) whether Dr. Hesselbrock was free to provide services to other entities while working for PN; (3) whether PN provided equipment, benefits, or training to Dr. Hesselbrock; (4) whether PN could or did modify Dr. Hesselbrock's duties; or (5) whether PN could terminate Dr. Hesselbrock's contract for reasons other than breach or unsatisfactory completion of her duties. *See Bermel,* ¶ 38; *Softrock,* ¶¶ 15-16; *Visible Voices, Inc. v. Indus. Claim Appeals Off.,* 2014 COA 63, ¶ 30.

¶ 17 For these reasons, we reverse the district court's ruling that Hesselbrock wasn't an employee. On remand, the court must make additional findings that are sufficient for a reviewing court to understand the basis of its decision. *See Chase,* ¶¶ 55, 59. The court's findings on remand must be based on the existing record.

¶ 18 Because of our disposition, we need not address Dr. Hesselbrock's contention that PN and Dr. Priebe were "employers" under the CWCA.

### III. Dr. Hesselbrock's Entitlement to Receivables Collected After Termination

¶ 19    PN contends that the district court erred by awarding Dr. Hesselbrock $42,742.39 related to revenue generated from work she performed before leaving but that PN collected after her termination date (post-termination collections). We disagree.

#### A.    Additional Facts

##### 1.    Compensation Structure and "Final Calculation"

¶ 20    Schedule I of the Agreement provides the terms of the "Physician Compensation Plan." Under the compensation plan, "each provider . . . receive[s] compensation based on that provider's own production of revenue after deducting the expenses attributable to that provider's practice." The compensation has two components. The first is a base salary, which is paid twice a month. The base salary is determined at the beginning of each calendar year and is essentially an estimate of the anticipated net revenue attributable to Dr. Hesselbrock based on (1) the revenue she generated in the previous year and (2) an estimate of "certain overhead expenses." At the time of her termination, Dr. Hesselbrock's base salary was $15,000 per month.

¶ 21 The second component is a quarterly bonus, which is paid if Dr. Hesselbrock generates revenue above the amount needed to "cover" her base salary plus the actual expenses attributable to her practice, such as payroll and income taxes, retirement contributions, benefits, and her share of central overhead. Conversely, if Dr. Hesselbrock's quarterly production falls short of the base salary plus practice expenses in any given quarter, she would be in a "deficit." The compensation plan requires Dr. Hesselbrock to remedy any deficit in the following quarter by generating more patient revenue to make up for the loss, by reducing her base salary, or by other means.

¶ 22 The compensation plan also provides that, in the event of termination, "a final calculation of the physician's compensation through the applicable date of termination of employment will be made using data then available to PN and such reasonable estimates, assumptions, interpolations, and extrapolations as may be necessary to equitably close out the physician's compensation account" (final calculation provision). If the physician owes a deficit to PN at the time of termination, she is required to pay the deficit in full.

## 2. Other Agreement Provisions

¶ 23 The parties' dispute involves the interaction of the final calculation provision with two other provisions in the Agreement. First, Section 4 of the Agreement states: "Physician acknowledges that Physician has no ownership interest in, or claim upon, the accounts receivable or work in process of PN *under any circumstance or at any time*." (Emphasis added.) Second, Section 6.5 provides:

> Physician may terminate this Agreement without cause upon ninety (90) days written notice to PN. Unless otherwise instructed by the Board, Physician will, during such ninety day period, continue to perform Physician's duties hereunder in accordance with Physician's assigned work schedule. During such ninety day period, Physician remains an employee and will continue to receive Physician's regular compensation. *Effective as of the 91st day following notification of termination without cause Physician shall cease to be a PN employee and compensation and benefits shall cease to accrue and/or be paid.*

(Emphasis added.)

## 3. District Court Ruling

¶ 24 Before trial, Dr. Hesselbrock argued that the final calculation provision entitled her to post-termination collections, minus reasonable estimated expenses. PN contended that, under Sections

12

4 and 6.5, Dr. Hesselbrock wasn't entitled to any revenue collected after her termination date.

¶ 25    In a pretrial order, the district court agreed with Dr. Hesselbrock and concluded that she was entitled to the post-termination collections. It reasoned that

- the final calculation provision was more specific than Sections 4 and 6.5 and, therefore, prevailed;

- Section 6.5 "cannot be read consistently with the contract to prevent recovery of compensation owed to a physician for work they actually performed" while treating patients at PN;

- Section 4's "no ownership" provision didn't address the issue of post-termination pay; rather, it dealt with the concern that a departing physician will claim unwarranted ownership of PN business assets; and

- reading Section 4 to foreclose receipt of post-termination collections would render the final calculation provision meaningless.

¶ 26    At trial, the parties presented evidence about the amount that PN owed Dr. Hesselbrock under the pretrial order. The district

court concluded that PN breached the final calculation provision, adopted Dr. Hesselbrock's calculation for the amount owed, and awarded her $42,742.39.

### B. Standard of Review and Applicable Law

¶ 27 Contract interpretation is a question of law that we review de novo. *Fed. Deposit Ins. Corp. v. Fisher*, 2013 CO 5, ¶ 9.

¶ 28 "The primary goal of contract interpretation is to determine and give effect to the intent of the parties," which we determine "primarily from the language of the instrument itself." *Ad Two, Inc. v. City & Cnty. of Denver*, 9 P.3d 373, 376 (Colo. 2000). An unambiguous contract "will be enforced according to [its] plain language." *Id.*

¶ 29 In interpreting a contract, courts seek to harmonize and give effect to all provisions so that none is rendered meaningless. *Fisher*, ¶ 12. The meaning of a contract is determined by examining "the entire instrument and not by viewing clauses or phrases in isolation." *U.S. Fid. & Guar. Co. v. Budget Rent-A-Car Sys., Inc.*, 842 P.2d 208, 213 (Colo. 1992).

## C. Analysis

¶ 30    PN asserts that the district court erred because Sections 4 and 6.5 of the Agreement preclude payment of post-termination collections to Dr. Hesselbrock.[2]  We disagree.

¶ 31    PN first argues that Sections 4 and 6.5 are the more specific contract provisions, which prevail over the general provision in the compensation plan.  *See Massingill v. State Farm Mut. Auto. Ins. Co.*, 176 P.3d 816, 825 (Colo. App. 2007).  However, we agree with the district court that the final calculation provision is more specific to the issue of compensation due to Dr. Hesselbrock upon termination, while Section 6.5 is a discussion about a physician's termination in general and Section 4 is related to PN's general billing practices.  Thus, to the extent that the final calculation provision conflicts with Sections 4 and 6.5, it prevails.  *Id.*

¶ 32    We also agree with the district court that PN's interpretation renders superfluous the Agreement's directive that PN make a "final

---

[2] PN appeals the district court's pretrial ruling that Dr. Hesselbrock was entitled to *any* post-termination collections.  However, it doesn't separately appeal the district court's calculation of the *amount* of post-termination collections that the court determined were owed to Dr. Hesselbrock.

15

calculation" of a departing physician's compensation. *See Copper Mountain, Inc. v. Indus. Sys., Inc.*, 208 P.3d 692, 700 (Colo. 2009) (courts seek "a construction of the contract that harmonizes [the] provisions instead of rendering them superfluous").

¶ 33    As explained above, the compensation plan provides for production-based compensation via (1) routine base salary payments and (2) a quarterly "true up" to determine whether the physician has generated more or less revenue than needed to cover her base salary and practice-related expenses. In the event of termination, the Agreement requires an "equitabl[e] close out" based on a "final calculation," using data then available to PN. The final calculation and "equitabl[e] close out" are, essentially, the last "true up." The Agreement's reference to using "reasonable estimates, assumptions, interpolations, and extrapolations" in the final calculation clearly contemplates estimating (1) revenue generated by the physician that hasn't yet been collected and (2) any accrued (but not yet paid) expenses related to generating that revenue. These estimates enable the parties to determine if PN owes the departing physician additional compensation or if the departing physician owes PN any "deficit." This is consistent with the general

compensation scheme that "each provider . . . receive[s] compensation based on that provider's own production of revenue after deducting the expenses attributable to that provider's practice."

¶ 34    Under PN's interpretation, payments to Dr. Hesselbrock would simply end on her termination date.  But if that were the case, there would be no need to perform a final calculation of any kind, much less one based on "reasonable estimates."  Like the district court, we decline to interpret the Agreement in a way that would render the final calculation provision meaningless.  *Id.*

¶ 35    For these reasons, we hold that the district court didn't err by concluding that Dr. Hesselbrock is entitled to her post-termination collections (minus estimated expenses) under the Agreement.

## IV.    Liquidated Damages Provision

¶ 36    On cross-appeal, PN contends the district court erred by ruling that the liquidated damages provision is unenforceable.  We disagree.

### A.    Additional Facts

¶ 37    As relevant here, Section 6.6 of the Agreement provides,

17

> Physician acknowledges and agrees that PN
> has an investment in Physician and
> Physician's practice and that PN will be
> economically injured in a material amount in
> the event Physician elects to terminate
> Physician's employment with PN under certain
> circumstances . . . .
>
> Should Physician leave PN and practice
> Medicine in the field of Neurology within a 30
> mile radius of PN within 1 year of termination
> of employment, Physician shall owe PN
> liquidated damages in the amount of 50%
> annualized salary.

¶ 38    Dr. Hesselbrock began practicing medicine at UC Health — within thirty miles of PN — less than one year after her separation from PN.  Around the same time, another physician at PN also terminated her contract and moved her practice to UC Health.  As a result, PN lost two of its three practitioners.  A medical assistant who worked primarily with the other departing physician also left PN for UC Health around that time.

¶ 39    Subsequently, ninety-six patients left PN.  Of those ninety-six patients, approximately thirty to forty patients began treatment with Dr. Hesselbrock at UC Health.  However, the district court found no evidence that Dr. Hesselbrock actively recruited those patients away from PN.

¶ 40   At trial, Dr. Priebe testified that the loss of ninety-six patients would result in estimated gross revenue losses of $43,200 per year. Additionally, he estimated that the cost of replacing Dr. Hesselbrock would be more than $100,000.  Dr. Priebe also testified about unquantifiable losses associated with Dr. Hesselbrock's departure, such as lost referrals, replacement of the medical assistant, and loss of reputation.

¶ 41   At the time Dr. Hesselbrock left PN, her annualized salary was $180,000; thus, PN requested $90,000 in liquidated damages.  The district court declined to award PN liquidated damages because it determined that no "reasonable relationship" existed between the liquidated damages and the actual damages PN suffered as a consequence of Dr. Hesselbrock's termination and competition.

### B.   Applicable Law and Standard of Review

¶ 42   A noncompete covenant that restricts the right of a physician to practice medicine upon termination of an employment, partnership, or corporate agreement between physicians is void.

§ 8-2-113(5)(a), C.R.S. 2024.[3]  However, section 8-2-113(5)(a) allows the enforcement of provisions "that require the payment of damages in an amount that is reasonably related to the injury suffered by reason of termination of the agreement," including "damages related to competition."

¶ 43    In determining whether the damages are "reasonably related to the injury," a court must examine "the injury actually suffered and not simply . . . an injury prospectively estimated at the time of contract formation."  *Crocker v. Greater Colo. Anesthesia, P.C.*, 2018 COA 33, ¶ 12.  PN concedes, and we agree, that it had the burden to show what injury it suffered as a result of Dr. Hesselbrock's termination and competition so that the court could determine whether the liquidated damages were reasonably related to the injury.

¶ 44    "We review the enforceability of a noncompete provision as a mixed question of fact and law.  To the extent that a legal determination turns on questions of fact, such as a finding of

---

[3] Section 8-2-113(5)(a) was amended in 2025; however, the amendment does not apply to this case.  *See* Ch. 366, sec. 1, § 8-2-113, 2025 Colo. Sess. Laws 1985.

reasonableness, we accept the district court's findings unless they are clearly erroneous." *Id.* at ¶ 15. However, we review de novo the court's application of the law. *Id.*

## C. Analysis

¶ 45 The district court ruled that no reasonable relationship existed between the liquidated damages and the actual injury PN suffered because PN's evidence didn't establish that the damages were directly caused by Dr. Hassebrock's departure. PN contends that the court erred, but we discern no basis for reversal.

¶ 46 In support of its contention, PN points to evidence about (1) lost patient revenue; (2) loss of the medical assistant; (3) reputational injury; (4) lost referral sources; (5) costs for recruiting a replacement for Dr. Hesselbrock; and (6) costs for onboarding a new physician, including relocation expenses and a sign-on bonus.

¶ 47 The record supports the district court's conclusion that at least some of these categories of damages weren't solely caused by Dr. Hesselbrock's departure from PN but were more likely the result of "the loss of two out of three practicing physicians" at the same time. *Cf. Reigel v. SavaSeniorCare L.L.C.*, 292 P.3d 977, 985-86 (Colo. App. 2011) ("Causation is a question of fact . . . unless the

21

facts are undisputed and reasonable minds could draw but one inference from them.").

¶ 48    Of the ninety-six patients who left PN, Dr. Hesselbrock testified that she began seeing at most forty of them in her new practice at UC Health. However, Dr. Hesselbrock didn't begin practicing at UC Health until June 2023 (nearly five months after her termination date); the list of departing patients included patients who left the practice between February 1, 2023 (the day after Dr. Hesselbrock's termination date) and February 1, 2024; and it was impossible to tell from the list when any individual patient left PN. Thus, some patients (including those who ended up seeking care from Dr. Hesselbrock) may have left PN before Dr. Hesselbrock began practicing at UC Health.[4] Further, the medical assistant who left the practice worked primarily with the other

---

[4] We also note that PN's estimated losses in future patient revenue were for gross revenue. *See Wojtowicz v. Greeley Anesthesia Servs., P.C.,* 961 P.2d 520, 522-23 (Colo. App. 1997) (reversing determination of reasonable relationship to actual losses where "[t]he trial court's conclusion as to the noncompetition provision is based on several theories of future lost profits which do not measure net earnings").

departing physician. And Dr. Priebe testified that the reputational losses were attributable to a "mass shift in providers."

¶ 49 We recognize that Dr. Priebe testified that PN suffered some unquantifiable monetary loss from lost referral sources and that he estimated that PN would have to pay costs to replace Dr. Hesselbrock if the replacement (1) came through a specific recruitment firm with which PN had contracted; (2) had to relocate to begin work; and (3) required a sign-on bonus. However, Dr. Priebe also testified that PN had "grown in providers historically since Dr. Hesselbrock left," and there was no evidence that PN had actually incurred recruitment fee, relocation, or sign-on bonus costs related to any of those new providers. Moreover, it was the district court's sole province to determine the weight to accord witness testimony, and the court wasn't required to accept Dr. Priebe's testimony about these potential costs, even if it was uncontroverted. *In re Estate of Owens*, 2017 COA 53, ¶ 22; *see also Wojtowicz v. Greeley Anesthesia Servs., P.C.*, 961 P.2d 520, 522 (Colo. App. 1997) (a damage award cannot be based on speculation and conjecture).

## V.    Disposition

¶ 50    The portions of the judgment regarding post-termination collections and liquidated damages are affirmed.

¶ 51    The portion of the judgment concluding that Dr. Hesselbrock was not an employee under the CWCA is reversed and remanded for proceedings consistent with this opinion.

JUDGE LIPINSKY and JUDGE SULLIVAN concur.