2015 COA 11M

RAGS OVER THE ARKANSAS RIVER, INC., a Colorado not-for-profit corporation, Plaintiff–Appellant,

v.

COLORADO PARKS AND WILDLIFE BOARD, f/k/a Colorado Board of Parks and Outdoor Recreation; Colorado Division of Parks and Wildlife, f/k/a Colorado Division of Parks and Outdoor Recreation; and Colorado Department of Natural Resources, Defendants–Appellees,

and

Over the River Corporation, a Colorado corporation, Intervenor–Appellee.

Court of Appeals No. 13CA1931

Colorado Court of Appeals,
Div. III.

Announced February 12, 2015

As Modified on Denial of Rehearing
March 26, 2015

Davis Graham & Stubbs LLP, Richard Kirk Mueller, Constance L. Rogers, Geoffrey C. Klingsporn, Mave A. Gasaway, Denver, Colorado, for Plaintiff–Appellant.

Cynthia H. Coffman, Attorney General, Tim Monahan, First Assistant Attorney General, Elaine J. Wizzard, Assistant Attorney General, Denver, Colorado, for Defendants–Appellees.

Kaplan Kirsh & Rockwell LLP, John E. Putnam, Lori Potter, Denver, Colorado, for Intervenor–Appellee.

Opinion by JUDGE DUNN

¶ 1 No doubt Colorado is a state blessed with natural beauty. Seeking, in their view, to highlight this beauty, several years ago artists Christo and Jeanne–Claude began a quest to install a large-scale art display over the Arkansas River (the Project). Over a decade after the initial application, the Colorado Division of Parks and Outdoor Recreation (Parks Division), through its Board,[1] authorized the Project.

¶ 2 Rags Over the Arkansas River, Inc. (ROAR), a nonprofit organization, seeks judicial review of the Parks Division's authorization of the Project, contending that the approval was arbitrary and capricious. Namely, ROAR alleges that the Parks Division: (1) failed to follow its regulations for issuing special activities permits and (2) unreasonably approved the Project contingent upon (a) authorization of the Project by the Bureau of Land Management (Bureau) and (b) implementation of mitigation requirements to be included in a not-yet-final federal Environmental Impact Statement.

¶ 3 We agree that the Parks Division's failure to adhere to its own special activities permit regulation in approving the Project was arbitrary. Because ROAR is unable to demonstrate prejudice as a result of the procedure by which the Project was approved,

however, we nonetheless affirm the Parks Division's approval of the Project.

I. Factual Background

¶ 4 The Arkansas Headwaters Recreation Area (AHRA) consists of a 148–mile stretch of river and surrounding land designated for outdoor pursuits including rafting, fishing, camping, and sightseeing. The AHRA is primarily managed by the Parks Division, but a majority of the land is federally owned and is thus under the Bureau's partial jurisdiction.

¶ 5 In 1996, Christo and Jeanne–Claude first approached the Parks Division to discuss their vision to suspend translucent fabric panels over approximately six miles of the Arkansas River. The fabric panels would roughly follow the changing width and course of the river and would be broken into several sections along the river's corridor. In the artists' view, the effect of the light passing through the overhead fabric would enhance the beauty of the river and its surroundings.

¶ 6 The artists formed Over the River Corporation (OTR), an intervenor in this action, to facilitate the Project. In accordance with the Parks Division's regulations, OTR applied for a special activities permit for the Project in 1997.

¶ 7 From 1997 until 2001, the Parks Division and the Board, in collaboration with other federal, state, and local agencies, began analyzing the possible impacts of the Project. Environmental, economic, safety, infrastructure, and wildlife impacts were the paramount concerns.

¶ 8 For a variety of reasons, the Project was largely dormant between 2001 and 2006. In 2007, the Parks Division and the Board entered into a formal agreement with the Bureau and other state and local agencies to coordinate further evaluation of the Project and to assist in the preparation of a federal Environmental Impact Statement. The formal agreement stated that the Parks Divi-

---

1. When the decision was made to authorize the Project, the primary decision-making body of the Parks Division was the Colorado Board of Parks and Outdoor Recreation. The combined Board is now known as the Colorado Parks and Wildlife Board, and the Division of Parks and Outdoor Recreation is now the Colorado Division of Parks and Wildlife.

sion would coordinate with other state agencies to ensure that all agencies were aware of the necessary mitigation requirements identified in the final Environmental Impact Statement before authorizing the Project.

¶ 9 Unrelated to the Project, the Parks Division and the Colorado Wildlife Commission were slated to merge in the summer of 2011. In May, shortly before the merger, the Wildlife Commission notified the Parks Division, the Bureau, and other participating agencies that it opposed the Project because of its impact on certain wildlife populations, including bighorn sheep and golden eagles.

¶ 10 Several days after the Wildlife Commission voiced its opposition, OTR sought a decision from the Parks Division on the Project. To that end, OTR presented a draft cooperative agreement for the Board's consideration. Although the Board had previously announced its intent to wait for the final Environmental Impact Statement to be issued before authorizing the Project, the Board decided to move forward with assessment of the Project. The Board also began negotiating approval of the Project through the cooperative agreement proposed by OTR, rather than issuing a special activities permit under its regulations.

¶ 11 A week before the Parks Division merged with the Wildlife Commission, the Board voted to authorize the Project through a memorandum of agreement (the Agreement) with OTR. The Agreement authorized OTR to install, exhibit, and remove the Project subject to a number of conditions. OTR agreed to, among other things, provide the Parks Division with a detailed Project schedule, pay a recreation impact fee, and implement mitigation measures after the Project's completion.

¶ 12 Final approval, however, was expressly conditioned upon the Bureau's authorization of the Project and compliance with "measures developed by the [Bureau] which are intended to mitigate the adverse environmental impacts of the OTR Project, require the implementation of the mitigation meas-

ures by OTR and provide for monitoring and enforcement of these mitigation measures."

¶ 13 ROAR sued the Parks Division in district court, seeking judicial review of the Project's approval. Among other relief requested, ROAR sought to enjoin the Project. In a written order entered on the pleadings, the district court concluded that the Board's approval of the Project through the Agreement was not arbitrary and capricious. As well, the court concluded that the agency's decision to approve the Project, reached after considering the impacts to the AHRA, was supported by sufficient record evidence. Accordingly, the court affirmed the Board's decision and dismissed ROAR's complaint.

## II.  Standard of Review

¶ 14 Our review of agency action is highly deferential. *Coffman v. Colo. Common Cause,* 102 P.3d 999, 1005 (Colo.2004). We must affirm an agency's decision unless we find that it is, among other things, arbitrary and capricious; in excess of statutory jurisdiction, authority, purposes, or limitations; an abuse of discretion; based upon erroneous findings of fact; or unsupported by substantial evidence. § 24–4–106(7), C.R.S. 2014; *Well Augmentation Subdistrict of Cent. Colo. Water Conservancy Dist. v. City of Aurora,* 221 P.3d 399, 417–18 (Colo.2009).

## III.  The Parks Division's Review and Approval of the Project

¶ 15 The General Assembly delegated the authority to develop regulations for management of the state parks and recreation areas and development of outdoor recreation programs to the Parks Board. *See* §§ 33–10–106, –107, C.R.S. 2014.[2]

¶ 16 Consistent with this statutory guidance, the Board issued regulations to manage the use of state parks and recreation areas. See Dep't of Natural Res., 2 Code Colo. Regs. 405–1:100 to –8:807. The regulations outline procedures for allowing members of the public to obtain a permit to conduct a special activity on areas under the Parks

---

**2.** *See* Ch. 248, sec. 33, § 33–10–107, 2012 Colo. Sess. Laws 1216. Notwithstanding the merger of the Parks Division and the Wildlife Commis-

sion, the organic statute is substantively unchanged. *See id.* Thus, this opinion will cite to the current statute.

Division's jurisdiction. See 2 Code Colo. Regs. 405–1:100, 1:101, 7:703.

¶ 17 The regulation broadly defines "special activities" as "those events which have the potential for a significant adverse impact on park values or the health, safety or welfare of park visitors or which may otherwise require special planning/scheduling for proper management." 2 Code Colo. Regs. 405–1:101(a). And the regulation states that "[s]pecial activities shall require prior approval in the form of a Special–Activities Permit." *Id.*

¶ 18 A person or entity seeking a permit must apply at least ninety days prior to the proposed event and pay a filing fee. 2 Code Colo. Regs. 405–7:703(1). The decision to approve special activities permits is made by the park manager or, in some cases, the regional manager. *Id.* at 405–7:703(2). Whether a permit is issued depends on several factors, such as the nature of the particular park, the size of the activity, the burden on park staff, and the impact on the park. *Id.* A permit will not be granted if the special activity would have a significant adverse impact on park values or the relevant area management plan. *Id.* at 405–7:703(3).

### A. Pursuit of Project Approval Under the Special Activities Regulation

¶ 19 In accordance with these regulations, OTR applied for a special activities permit for the Project in 1997. Because of the scale of the Project, the Parks Division formed a multi-agency permit planning team to analyze the application.

¶ 20 For roughly thirteen years, OTR, the Parks Division, and the Board treated the Project as a special activity and proceeded under the special activities permit regulation:

- At a 1997 public outreach meeting, members of the permit team thanked the public for "participating in the process of determining if a permit should be grant-

ed or denied to Christo and Jean[ne]–Claude."

- A 1997 analysis of the Project noted that a "Colorado State Parks Special Event Permit" was needed.

- In 1998, the Board wrote that, per the regulations, the "ultimate decision in approving the Project" may "rest with the Regional Manager" per the special activities regulation.[3]

- In 2000, an information bulletin about the Project indicated that the Parks Division would issue a "special event permit."

- A 2001 Board meeting agenda also stated that that the Parks Division would issue a special event permit for the Project.

- In 2006, the Board reaffirmed that approval of the Project would be through a "Colorado State Parks Special Activity Agreement."[4]

- In 2009, another Board meeting agenda noted that, "the Parks Board will ... consider issuing a Colorado State Parks Special Activity Agreement" for the Project.

¶ 21 In September 2010, however, some confusion arose regarding the form that the permit would take. For example, in a PowerPoint presentation made to the Board that month, a slide stated the permit "would not look like a special activities permit." Yet, another slide in the same presentation suggested that the Parks Division would issue a special activities permit.[5] And during the meeting, a Board representative stated, "State Parks will have the special use permitting part of [the Project]." Later in that meeting, however, the same representative indicated that the permit would not look exactly like a special activities permit. Despite some inconsistent statements regarding the form of the permit, the administrative record reflects no real dispute either that the Project was a special activity under the regulation or that a permit was required.

---

3. At a January 1998 Board meeting, while the Board acknowledged that the special activities regulation appeared to cater to smaller events, the Board discussed means by which the regulation could be adapted to accommodate the Project.

4. Though unclear, the administrative record suggests that the special activities permit was issued on a form titled "Colorado State Parks Special Activity Agreement."

5. The administrative record does not reflect the source of this PowerPoint presentation.

### B. Project Authorization Through the Agreement

¶ 22 After the Wildlife Commission expressed its disapproval of the Project but before the merger with the Parks Division, OTR's counsel requested that the Parks Division "work toward an agreement fairly soon." Counsel for OTR then submitted a proposed "memorandum of agreement" to the Board that purported to authorize the Project. At the May 2011 Board meeting, the Board, with little explanation, abandoned the special activities permitting process. Instead, the Board switched course and approved negotiation of a cooperative agreement with OTR.

¶ 23 The June 2011 Board meeting was dedicated almost entirely to the Project. A Board representative tasked with responsibility for analyzing the Project spoke about the draft agreement. Throughout his presentation, the representative did not mention issuing a special activities permit. He did, however, rely on other parts of the special activities regulation. For example, in advocating for greater monetary compensation for the Parks Division, he said, "under our regulations, Section 703, I believe ... [a] special use activity fee" may be collected. And, even the Agreement itself references portions of the special activities regulation, including a clause waiving parking fees generally charged for special activities. Notwithstanding the Board's selective reliance on portions of the special activities regulation, and the regulatory requirement that a permit "shall" be required for any special activities, the Board concluded that the Agreement was the "appropriate way" to handle the Project.

¶ 24 The only contemporaneous explanation for the Board's change in course came in response to a public comment that the Board was not following its permitting regulations. Answering this concern, a representative agreed that the Project "could have been handled as a special activities permit under the regulation." However, the representative stated that approving the Project through the Agreement allowed the Board, rather than the regional manager, to be "involved in the actual decision." At the close of the June 2011 meeting, the Board voted to approve the Agreement.

### IV. Interpretation of Agency Regulations

¶ 25 Upon enacting regulations, an agency is bound by them. *Service v. Dulles*, 354 U.S. 363, 388, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); accord *Cherokee Nation of Okla. v. Norton*, 389 F.3d 1074, 1078 (10th Cir.2004); see also *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. Envtl. Protection Agency*, 752 F.3d 999, 1011 (D.C.Cir.2014) ("[An] agency is not free to ignore or violate its regulations while they remain in effect." (internal quotation marks omitted)). It is in fact "axiomatic that an agency must adhere to its own regulations." *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 536 (D.C.Cir.1986). This ensures reliability and fairness. *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1368 (11th Cir.2008) (Kravitch, J., concurring in part and dissenting in part).

¶ 26 Indeed, requiring an agency to follow its own regulations comports with principles of due process; that is, the public is entitled to know the manner in which an agency will render a decision and the factors the agency will consider. *See Lobato v. Indus. Claim Appeals Office*, 105 P.3d 220, 228 (Colo.2005) (due process principles require agencies to put individuals on notice of the agency's procedures); accord *Montilla v. Immigration & Naturalization Serv.*, 926 F.2d 162, 164 (2d Cir.1991) (the "notion of fair play" precludes an agency from having promulgated a regulation affecting individual interests and then ignoring or disregarding the regulation in its discretion). In light of these principles, "[t]he failure of an agency to comply with its own regulations constitutes arbitrary and capricious conduct." *Simmons v. Block*, 782 F.2d 1545, 1550 (11th Cir.1986). An agency must scrupulously follow the regulations and procedures it promulgates and, if it does not, the court may strike the agency's action. *See id.; see also United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266–67, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *Exportal LTDA v. United States*, 902 F.2d 45, 46 (D.C.Cir.1990) (reversing agency action that was "flatly inconsistent with the plain terms" of the agency's regulations);

Am. Fed'n of Gov't Emps., AFL–CIO, Local 3090 v. Fed. Labor Relations Auth., 777 F.2d 751, 758 (D.C.Cir.1985) (agency action that is inconsistent with its existing regulations cannot be sustained by the court).

¶ 27 Thus, while an agency's reasonable interpretation of its own regulations is ordinarily entitled to deference, Chase v. Colo. Oil & Gas Conservation Comm'n, 2012 COA 94, ¶ 20, 284 P.3d 161, an interpretation that is inconsistent with the plain language of the regulation is not. Udall v. Tallman, 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); accord Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); see also Exportal, 902 F.2d at 50 (where agency regulation is unambiguous, the court does not defer to agency's interpretation). Nor do we defer to an agency's interpretation that is inconsistent with its own rules or policy. Williams v. Kunau, 147 P.3d 33, 36 (Colo.2006); see Tebbetts v. Whitson, 956 P.2d 639, 641 (Colo.App. 1997) ("[N]o deference is given when the agency's interpretation is inconsistent with its own rules."). It follows that we may reject an agency's interpretation of its regulations if the language of the regulation compels a different meaning. Exportal, 902 F.2d at 50–51; see also Chase, ¶ 23. Indeed, where a regulation plainly requires a different interpretation, "[t]o defer to the agency's position would be to permit the agency, under the guise of interpreting a regulation, to create de facto a new regulation." Christensen v. Harris Cnty., 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000).

¶ 28 We construe agency regulations as we do a statutory provision; we look first to the regulation's plain language. Gessler v. Colo. Common Cause, 2014 CO 44, ¶ 12, 327 P.3d 232; Chase, ¶ 22. If the plain language is unambiguous, we need not resort to other canons of construction. See Vigil v. Franklin, 103 P.3d 322, 327 (Colo.2004). All words not otherwise defined in the administrative regulation should be attributed their ordinary and customary meanings. Gessler,

¶ 22; Williams v. Colo. Dep't of Corr., 926 P.2d 110, 112 (Colo.App.1996).

## V. The Parks Division's Failure to Follow its Regulation

¶ 29 ROAR asserts that the Board was required to follow its special activities permit regulation, and the failure to do so was arbitrary and capricious. The Parks Division counters that because the special activities permit regulation was not designed to accommodate an event of the Project's size and duration, a special activities permit was not required.

¶ 30 The Parks Division does not dispute that the Project is a special activity within the regulation's definition.[6] Nor does it dispute that, for at least thirteen years, the Project was treated as a special activity requiring a permit. Rather, the Parks Division argues that the special activities permit is not the exclusive means by which the Project could be approved; thus, it could depart from the regulation at its discretion. Because the plain language of the regulation dictates otherwise, we disagree.

¶ 31 The special activities regulation states that "special activities shall require prior approval in the form of a Special-Activities Permit." 2 Code Colo. Regs. 405–1:101(a). This language is categorical, and unambiguously prescribes a mandatory procedure. See Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 661, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007); accord Associated Gov'ts of Nw. Colo. v. Colo. Pub. Util. Comm'n, 2012 CO 28, ¶ 48, 275 P.3d 646 ("The word 'shall' is mandatory."). It thus imposes "discretionless obligations" on the agency. Home Builders, 551 U.S. at 661, 127 S.Ct. 2518 (internal quotation marks omitted); see also Exportal, 902 F.2d at 50–51 (agency had no discretion to deny a bond waiver where the regulation stated the bond "shall be waived").

¶ 32 Had the Parks Division intended to make the special activities permitting regula-

---

6. OTR argues that the Project is not an "event," as the term is used in the special activities regulation, because the regulation applies only to events of short duration. Because the Parks Division concedes that the Project fits within the special activities definition, OTR's contention to the contrary carries little weight.

tion discretionary, it could have drafted the regulation to accomplish that goal. That is, the regulation could have simply preserved the Parks Division's discretion to waive the permit requirement. Or it could have expressly provided methods for excluding an event from the permitting regulation based on the event's size, scope, duration, or other consideration. Yet it did not. *See Watson v. Pub. Serv. Co. of Colo.*, 207 P.3d 860, 867 (Colo.App.2008) (had the legislative body intended a statute to guarantee a particular result, it would have specifically so indicated). Nothing in the language of the regulation notifies the public that any particular event or activity is excluded from the regulation or may be authorized through other means. We do not assume the language is imprecise; rather, we conclude that the regulation means what it says—a permit is required to conduct a special activity in a park. *See Colo. Water Conservation Bd. v. Upper Gunnison River Water Conservancy Dist.*, 109 P.3d 585, 593 (Colo.2005).

¶ 33 Notwithstanding the regulation's plain language, the Parks Division contends that "shall" does not mean "shall." It argues that to interpret "shall" consistent with its ordinary meaning leads to an absurd result. This is so, according to the Parks Division, because a special activities permit could not have been used in this case.

¶ 34 This argument is not persuasive for two reasons. First, it is inconsistent with the language of the regulation, which nowhere suggests that "shall," as used in the regulation's text, should be interpreted contrary to its ordinary and plain meaning. Second, it directly conflicts with the Board's express admission that the Project "could have been handled as a special activities permit under the regulation." During the Project's extensive review, neither the Parks Division nor the Board ever concluded the regulation did not apply or that its application was absurd or illogical. Rather, for over a decade, the Parks Division, Board, and OTR—fully aware of the breadth and com-

plexity of the Project—proceeded under the special activities regulation. The Board's later conclusion that the special activities permitting regulation was optional is thus not entitled to deference. *See Tebbetts*, 956 P.2d at 641 (no deference is owed to an agency's inconsistent interpretation of its regulations).

¶ 35 To the extent the Parks Division's assertion that the special activities regulation is ill-suited for an event of the Project's scope is accurate,[7] any such flaw in the regulation must be addressed through formal agency rulemaking, not case-by-case decisions by the Parks Division as to whether it deems the regulation to apply. *See Morton v. Ruiz*, 415 U.S. 199, 235, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974) (ad hoc determinations of an agency not promulgated in accordance with rulemaking procedures cannot stand); *see also Charnes v. Robinson*, 772 P.2d 62, 66 (Colo.1989) (an agency is required to proceed by formal rulemaking if it wishes to change a regulation; it cannot do so in the course of adjudicating an individual case).

¶ 36 To infuse notice and comment rulemaking with any meaning, a regulation must be enforced as written. Otherwise, "if permitted to adopt unforeseen interpretations, agencies could constructively amend their regulations while evading their duty to engage in notice and comment procedures." *Exportal*, 902 F.2d at 50; *see also Charnes*, 772 P.2d at 66 (in dealing with an agency, the public is entitled to know the "rules of the game" (internal quotation marks omitted)).

¶ 37 In short, the plain language of the special activities permitting regulation is mandatory. The Parks Division's decision to abandon the regulation and approve the Project through the Agreement is inconsistent with the regulation's plain language and is not entitled to deference.

## VI. The Enabling Statute

¶ 38 Even so, the Parks Division and OTR contend that the broad language of section

7. In the Parks Division's view, that the regulation (1) places the ultimate decision for permit approval in the hands of either the park or regional manager; (2) requires that an application be filed only ninety days in advance; and (3) sets

the application fee at only $20, suggests that the regulation may not have contemplated events of the Project's scale. *See* Dep't of Natural Res., 2 Code Colo. Regs. 405–7:703(2).

33–10–107(1)(d) authorized the Board to approve the Project through the Agreement irrespective of the special activities regulation. *See* § 33–10–107(1)(d) (Parks Division may enter into cooperative agreements for the development and promotion of parks and outdoor recreation programs). It follows, they contend, that the Parks Division could unilaterally decide whether to authorize the Project through an agreement or through the permit regulation. That is, in their view, broad statutory authority trumps any regulations restraining an agency's discretion. We are not persuaded.

¶ 39 If an agency promulgates regulations that are more exacting than otherwise constitutionally mandated, due process requires the agency to strictly adhere to its regulations. *Dep't of Health v. Donahue*, 690 P.2d 243, 249 (Colo.1984); *Carpenter v. Civil Serv. Comm'n*, 813 P.2d 773, 777 (Colo.App. 1990); *see also Otero v. N.Y.C. Hous. Auth.*, 344 F.Supp. 737, 745 (S.D.N.Y.1972) (an agency that ignored its own regulations effectively denied plaintiffs due process of law). "[E]ven if the applicable statutes confer complete discretion on agency actors, if those actors have the authority to constrain their discretion by promulgating [regulations], and they choose to do so, they have created law that can serve as the basis for judicial review." Thomas W. Merrill, *The Accardi Principle*, 74 Geo. Wash. L.Rev. 569, 605 (2006).

¶ 40 *Department of Health v. Donahue* is particularly instructive. 690 P.2d 243. In *Donahue*, the Colorado Supreme Court held that when a regulation "imposes on governmental departments more stringent standards than are constitutionally required, due process of law requires [agencies] to adhere to those standards." *Id.* at 249. Though *Donahue* did not specifically address whether a regulation can limit an otherwise broad grant of statutory authority, the United States Supreme Court has. *E.g., Dulles*, 354 U.S. 363, 77 S.Ct. 1152; *Vitarelli v. Seaton*, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); *Morton*, 415 U.S. 199, 94 S.Ct.

1055, 39 L.Ed.2d 270. These cases confirm that the scope of an agency's discretion under its enabling statute is largely beside the point once the agency has adopted regulations that limit the agency's discretion. In such instances, the agency is bound by its regulations notwithstanding broad statutory discretion. *See, e.g., Morton*, 415 U.S. at 235, 94 S.Ct. 1055; *Vitarelli*, 359 U.S. at 540, 79 S.Ct. 968; *Dulles*, 354 U.S. at 388–89, 77 S.Ct. 1152.[8]

¶ 41 In *Dulles*, for instance, the Secretary of State had broad statutory authority to unilaterally terminate Foreign Service Officers. 354 U.S. at 370, 77 S.Ct. 1152. The State Department regulations, however, required a hearing and a recommendation for dismissal by the Under Secretary before an officer could be dismissed. *Id.* at 374–75, 77 S.Ct. 1152. Although the regulations were initially followed, the Secretary of State ignored the hearing proceedings and terminated the employee. *Id.* at 376, 77 S.Ct. 1152. The Supreme Court concluded that the discharge was invalid because the Secretary of State did not follow State Department regulations. *Id.* at 383, 77 S.Ct. 1152.

¶ 42 Likewise, in *Vitarelli*, the Court concluded that an agency employee was improperly discharged where the Secretary of the Interior did not adhere to the regulations for discharging an employee as a security risk. 359 U.S. at 539–40, 79 S.Ct. 968. This was so even though the employee could have been summarily dismissed without cause under executive and statutory authority. *Id.* Once the Secretary of the Interior treated the employee as a security risk, however, the agency's regulations applied. *Id.* In his opinion concurring in part and dissenting in part, Justice Frankfurter commented that "if dismissal from employment is based on a defined procedure, even though generous beyond the requirements that bind such agency, that procedure must be scrupulously observed." *Id.* at 546–57, 79 S.Ct. 968; *see also Morton*, 415 U.S. at 205, 94 S.Ct. 1055.

¶ 43 The enabling statute here granted the Board discretion to "[e]nter into cooperative

---

8. To be sure, where an administrative regulation directly conflicts with its enabling statute, the enabling statute controls. *See, e.g., Colo. Consumer Health Initiative v. Colo. Bd. of Health*, 240 P.3d 525, 528 (Colo.App.2010). That, however, is not the circumstance presented here.

agreements with ... corporations ... for the development and promotion of parks and outdoor recreation programs." § 33–10–107(1)(d). Though the statute confers discretion on the Board to enter into such cooperative agreements, the Board promulgated specific regulations outlining a mandatory process for permitting special activities within parks.[9] Nothing in the statute authorizes the Board to ignore its regulations. The statute therefore must give way to the regulation. *See Vitarelli,* 359 U.S. at 540, 79 S.Ct. 968; *see also Exportal,* 902 F.2d at 49 (rejecting agency's argument that it could disregard mandatory regulation based upon discretion conferred in statute).

¶ 44 Nor are we persuaded by the Parks Division's and OTR's arguments that, because commercial outfitters such as fly-fishing or rafting guides are licensed to operate in the park through concession agreements rather than special activities permits, a permit was not required here. While the regulations separately contemplate concession agreements, only commercial events may be permitted through a concession agreement. 2 Code Colo. Regs. 405–1:100(b)(10). Thus, accepting OTR's characterization of the Project as noncommercial, the Project could not have been authorized through a concession agreement. *See id.* In any event, the parties did not enter into a concession agreement for the Project, and therefore, that particular regulation is not at issue.

¶ 45 Accordingly, we conclude that the Parks Division's decision to abandon the special activities permitting regulation and authorize the Project through the Agreement was arbitrary and capricious. VII. Project Approval Contingent upon the Bureau's Decisions

¶ 46 ROAR also contends that the Board's approval of the Agreement was arbitrary and capricious because it was contingent upon (1) the Bureau's approval of the Project and (2) mitigation conditions imposed in the final Environmental Impact Statement that had not been issued at the time the Board and

OTR entered the Agreement. Essentially, ROAR argues that authorization of the Project was not supported by substantial evidence. We do not agree.

### A. Project Review

¶ 47 From 1997 to 2011, the Parks Division and Board engaged in substantial analysis of the impacts—both positive and negative—of the Project. Specifically, in 2007 the Parks Division entered into a memorandum of understanding with the Bureau and several other state and local agencies, including, among others, the Department of Natural Resources, the Division of Wildlife, the Department of Transportation, the State Patrol, and county commissioners to coordinate analysis of the Project. The intent of the memorandum of understanding was to assist the Bureau in preparing an Environmental Impact Statement and to coordinate evaluation of the Project.

¶ 48 Additionally, members of the Board visited the proposed Project sites and solicited extensive public comment on the Project. On several occasions, the Parks Division and Board listened to OTR's presentations on the Project and heard from Project opponents, including ROAR.

¶ 49 Adverse impacts considered by the Parks Division and Board included the effect on wildlife, particularly on protected species such as bighorn sheep, golden eagles, and other raptors. And the permit planning team evaluated proposed wildlife mitigation measures.

¶ 50 The permit planning team and the Board also considered the benefits of the Project. The Board determined that the Project met the goal of promoting the parks. *See* 2 Code Colo. Regs. 405–7:703(2); *see also* § 33–10–107(1). Specifically, the Board found that the Project would enhance the recreational opportunities available to visitors, and perhaps interest a new generation of park-goers.

---

**9.** The administrative record does not contain any discussion regarding the enabling statute or whether the Project is a "program" under the statute. This is probably because OTR and the

Parks Division agreed during the administrative proceedings that the special activities regulation applied.

¶ 51 To examine logistical concerns, the permit planning team consulted with the Department of Transportation and local Sheriffs' offices. And the Board created an event management plan to protect the interests of the Parks Division with the understanding that OTR would cover anticipated administrative costs.

¶ 52 Lastly, the Board extensively reviewed the draft Environmental Impact Statement issued by the Bureau. The draft identified potential harmful impacts of the Project, but proposed ways to mitigate those impacts. The Board met often to discuss the findings of the draft and next steps.

¶ 53 The Board ultimately approved the Agreement before the final Environmental Impact Statement was published. The Board's approval of the Project was contingent on the Bureau's authorization of the Project as well as mitigation conditions to be included in the final Environmental Impact Statement.

### B. Legal Standards

¶ 54 Where the record, viewed as a whole and in the light most favorable to the agency, contains a reasonable basis and substantial evidence to support the agency's decision, the decision must be upheld. § 24–4–106(7); *Bodaghi v. Dep't of Natural Res.*, 995 P.2d 288, 303 (Colo.2000) (when there is conflicting evidence the agency's determination is binding and a reviewing court may not substitute its judgment for that of the factfinder); *accord Inst. for Research v. Bd. of Assessment Appeals*, 748 P.2d 1346, 1348 (Colo.App.1987).

¶ 55 Whether the record contains substantial evidence to support an agency's final decision is a question of law, which we review de novo. *Chase*, ¶ 21. We defer to an agency decision involving factual and evidentiary matters within an agency's specialized or technical expertise. *See Trans Shuttle, Inc. v. Colo. Pub. Util. Comm'n*, 89 P.3d 398, 404–05 (Colo.2004).

¶ 56 The special activities regulation requires review and consideration of the nature of the desired park or recreation area, the total number of anticipated visitors and vehicles expected to participate in the event, the extent to which the activity will contribute to the variety of available outdoor recreational opportunities, and the burden placed on park staff. 2 Code Colo. Regs. 405–7:703(2). A permit shall be denied for a special activity that would, among other things, have "significant adverse impact on park values, pose significant threats to the health, safety or welfare of park visitors or other person[s], [or] be inconsistent with area management plans...." *Id.* at 405–7:703(3).

### C. The Board Considered Relevant Factors

¶ 57 As the agency with expertise in the management and operation of our state parks, the Parks Division is tasked with balancing competing interests—namely, promoting the parks while still protecting wildlife, vegetation, and park ecosystems. § 33–10–101, –106.

¶ 58 The administrative record reflects that the Parks Division and Board fulfilled this obligation by weighing and considering the relevant factors and competing interests to determine whether to authorize the Project. *See* 2 Code Colo. Regs. 405–7:703(2) (listing the factors that must be analyzed to grant a special activities permit). Specifically, the Board found that the Project would promote the parks by increasing visitors, showcasing Colorado's natural beauty, and "contribut[ing] to the variety of outdoor recreational opportunities available." *See id.* at 405–7:703(2)(c). Weighed against these benefits, the Board also considered the adverse environmental impacts of the Project and public safety concerns, as well as plans to mitigate any adverse impacts.

¶ 59 The Board ultimately concluded that the positive effects of the Project outweighed its negative impacts. We are not at liberty to substitute our judgment for that of the agency. *See, e.g., Bodaghi*, 995 P.2d at 303 (the court of appeals erred in parsing through the record and substituting its own conclusion for that of the administrative law judge); *accord Colo. Office of Consumer Counsel v. Pub. Util. Comm'n*, 786 P.2d 1086, 1091 (Colo.1990). Because the record supports the Board's approval of the Project, we may not disturb it. *See Nicholas v. N.Colo.*

*Med. Ctr.,* 902 P.2d 462, 473 (Colo.App.1995) (a court should uphold an agency's conclusion if it is grounded in some evidence in the record).

¶ 60 We are similarly unconvinced that approval of the Project should be invalidated because it was conditioned on the contents of the pending final Environmental Impact Statement. Nothing in the Parks Division's regulations mandates or prohibits consideration of an Environmental Impact Statement, which is a federal, not state, requirement. *See Silverton Snowmobile Club v. U.S. Forest Serv.,* 433 F.3d 772, 780 (10th Cir.2006). Rather, the regulation specifies which factors the Board must consider, and here, the Board reviewed the appropriate factors. *Cf. Citizens' Comm. to Save Our Canyons v. Krueger,* 513 F.3d 1169, 1176 (10th Cir.2008) (a reviewing court must determine if the agency considered all relevant factors).

¶ 61 To be sure, the Board considered more factors than required by its regulation, including mitigation proposals incorporated in the draft Environmental Impact Statement. That the Board approved the Project contingent on mitigation conditions to be incorporated in the final Environmental Impact Statement does not render its decision arbitrary and capricious or based on insufficient evidence.[10] *See Sierra Club v. Slater,* 120 F.3d 623, 636 (6th Cir.1997) (finding that it is not necessary to have a final, detailed mitigation plan prior to the issuance of section 404 permit under the Clean Water Act).

¶ 62 The Parks Division and the Bureau are cooperating agencies, each with jurisdiction over aspects of the Project. Both agencies considered and ultimately approved the Project subject to their respective areas of expertise. The administrative record confirms the Board was aware of mitigation conditions the Bureau would likely include in the final Environmental Impact Statement. Thus, in these circumstances, we do not agree that the Board's approval was not sup-

ported by sufficient evidence merely because it was conditioned upon the Bureau's approval or mitigation requirements to be included in the final Environmental Impact Statement. *Id.* (an agency-issued permit may be conditioned on future implementation of a mitigation plan in compliance with environmental statutes); *see also Town of Superior v. U.S. Fish & Wildlife Serv.,* 913 F.Supp.2d 1087, 1106–08 (D.Colo.2012) (deferring to the agency's determination that mitigation measures to be later determined and implemented will meet the statutory requirement to minimize the environmental impact of any agency-approved action).

¶ 63 Accordingly, we conclude that the Board's authorization of the Project is supported by sufficient evidence.

## VII. The Project's Approval was Not Prejudicial

¶ 64 The Parks Division lastly contends that any error in failing to comply with the special activities regulation was harmless. We agree.

¶ 65 "The harmless error rule applies to judicial review of administrative proceedings, and errors in such administrative proceedings will not require reversal unless [p]laintiffs can show they were prejudiced." *Sheep Mountain Alliance v. Bd. of Cnty. Comm'rs,* 271 P.3d 597, 606 (Colo.App.2011) (internal quotation marks omitted); *accord Bar MK Ranches v. Yuetter,* 994 F.2d 735, 740 (10th Cir.1993). Where the agency's mistake did not affect the outcome of the proceedings, "it would be senseless to vacate and remand for reconsideration." *Jicarilla Apache Nation v. U.S. Dep't of Interior,* 613 F.3d 1112, 1121 (D.C.Cir.2010). Thus, if an agency finding is reasonable and sustainable, impropriety in the process by which the decision was reached is not a basis for reversal. *See Home Depot USA v. Pueblo Cnty. Bd. of Comm'rs,* 50 P.3d 916, 919 (Colo.App.2002).

10. At oral argument, ROAR contended that the draft Environmental Impact Statement failed to establish certain critical facts, such as the exact location of the Project. Given that the Board is not required to consider the Environmental Impact Statement, the Parks Division's decision to include additional mitigation conditions to be enumerated in the final Environmental Impact Statement cannot be deemed arbitrary.

¶ 66 True, the Parks Division did not comply with its special activities permit regulation in approving the Project. But the Board nonetheless considered all the factors required by that regulation. That is, the Board examined the nature and capacity of the park, the extent to which the Project would contribute to the variety of available recreational opportunities, the administrative burden on staff, and the Project's potential impact on the park. As required, the Board sought, received, and considered public comment, both positive and negative. *See* 2 Code Colo. Regs. 405–7:703(4).[11] The Board thus complied with the substance of the special activities permitting regulation.

¶ 67 Nothing in the administrative record supports the conclusion that the decision would have been different had the Parks Division proceeded under its special activities regulation. ROAR does not identify any particular prejudice that resulted because approval of the Project was through the Agreement rather than the special activities permit regulation.

¶ 68 Had the special activities regulation been strictly followed, the regional or park manager would have made the final approval decision, not the Board. But the fact that a different decision-maker gave the final approval, standing alone, does not show prejudice. An appeal of a similar procedural flaw was rejected in *Schaefer v. McHugh*, 608 F.3d 851 (D.C.Cir.2010). There, the plaintiff contended that the incorrect Army entity revoked the authorization for his discharge. During the administrative appeal process, the agency determined that "any de minimis violation of regulations when the Army revoked [plaintiff's] discharge did not harm [plaintiff]." *Id.* at 854. The District of Columbia Circuit Court of Appeals agreed, concluding that plaintiff failed to show any prejudice resulting from the Army's alleged error as to which entity could technically revoke authorization for his discharge. *Id.*

¶ 69 That is not to say that prejudice may never result where a decision-maker—other than the one authorized by regulation—makes the final decision, but the administrative record must support a finding of prejudice. If the record is silent regarding prejudice, then a remand might be in order. *Cf. Wagner v. United States*, 365 F.3d 1358, 1359, 1364–65 (Fed.Cir.2004) (remand necessary where the administrative record lacked evidence demonstrating that the agency's failure to obtain the Secretary of the Army's pre-approval before initiating involuntary discharge proceedings against plaintiff—as required by its regulation—was harmless).

¶ 70 But the administrative record here is extensive and clear, and contains no evidence suggesting prejudice. ROAR identifies nothing in the administrative record to support the conclusion that the regional or park manager would have acted differently and denied a special activities permit for the Project. Rather, the record shows that as early as 1998, recognizing the Project's scope, the park manager sought the Board's input and advice on the Project. Thus, the administrative record suggests that even had the regional or park manager made the final decision, his or her determination would reflect the Board's input and recommendation. In these circumstances the administrative record supports the conclusion that had the special activities permitting regulation been followed, a permit would have issued and the outcome would have been the same.

¶ 71 At bottom, ROAR's disagreement with the authorization of the Project is a disagreement with the Project itself—not the process used to approve the Project. But that is not enough to establish the prejudice necessary to invalidate an agency action. Because ROAR has not met its burden of demonstrating that the Board's failure to follow the special activities permitting regulation was prejudicial, the Board's decision must be affirmed.

## VIII. Conclusion

¶ 72 The order dismissing ROAR's complaint is affirmed.

---

11. Nor does the administrative record contain any express findings by the Board that the Project would have a "significant adverse impact on park values, pose significant threats to the health, safety or welfare of the park visitors or other person[s], [or] be inconsistent with area management plans." 2 Code Colo. Regs. 405-7:703(3).

JUDGE HAWTHORNE concurs.

JUDGE DAILEY specially concurs.

JUDGE DAILEY, specially concurring.

¶ 73 I concur in the judgment but on grounds different from those relied on by the majority.

¶ 74 The majority upholds the Board's action,[1] concluding that, although the Board erred in approving the Project via a cooperative agreement, its error was harmless. Unlike the majority, I would hold that the Board did not err in the first place.

¶ 75 As the Board admits, the Project qualified as a special activity within the meaning of the special activities regulation, see Dep't of Natural Res., 2 Code Colo. Regs. 405–1:101(a) & 405–7:703(1). But, as the Board and intervenors contend, the Project also qualified as a "program" which the Board was legislatively authorized to approve via a cooperative agreement. *See* Ch. 245, sec. 2, § 33–10–107(1)(d), 1984 Colo. Sess. Laws 885 (empowering the Board to "[e]nter into cooperative agreements with state and other agencies, educational institutions, municipalities, political subdivisions, corporations, clubs, landowners, associations, and individuals for the development and promotion of parks and outdoor recreation programs").[2]

¶ 76 Although the Project falls within the terms of both the statute and the special activities regulation, the majority holds that the Board lacked the authority to approve the Project via the statutory route, that is, by cooperative agreement. This follows, the majority says, because by using the term "shall" in the special activities regulation, the Board limited the manner in which the Project could be approved to that of obtaining a special activities permit from either a park manager or regional manager. *See* 2 Code Colo. Regs. 405–7:703(5).[3] Under this view, through its regulation, the Board divested itself of any authority with respect to whether (and if so, how) a project of this magnitude and complexity would be conducted within the confines of the AHRA. This does not make sense to me.

¶ 77 Initially, I note that "[t]he same rules of construction used to interpret a statute should be applied to interpret a rule or regulation." *People in the Interest of M.K.D.A.L.*, 2014 COA 148, ¶ 5, ⸺ P.3d ⸺ (internal quotation marks omitted).

¶ 78 As I understand the majority's opinion, it rests upon an application of the "plain meaning" rule of statutory interpretation: the word "shall" must be given its ordinary mandatory or imperative meaning. *See Riley v. People*, 104 P.3d 218, 221 (Colo.2004) ("There is a presumption that the word 'shall' when used in a statute is mandatory.").

¶ 79 But the word "shall" does not inevitably carry with it a mandatory meaning. *Estate of Guido v. Exempla, Inc.*, 2012 COA 48, ¶ 25, 292 P.3d 996 ("[T]he term "shall" is *usually* interpreted to make the provision in which it is contained mandatory.") (emphasis added); *see Nw. Natural Gas Co. v. Clark Cnty.*, 98 Wash.2d 739, 658 P.2d 669, 671 (1983) ("The word 'shall' need not always be construed as mandatory."); *see also Hunt v. Heaton*, 631 S.W.2d 549, 550 (Tex.App.1982) ("Although the word 'shall' is generally construed to be mandatory, it may be ... held to be directory. In addition, a statute may be mandatory in some respects and directory in others." (citation omitted)), *aff'd*, 643 S.W.2d 677 (Tex.1982).

¶ 80 The use of the term "shall," then, "is not the sole determinant, and what it naturally connotes can be overcome by other considerations." 3 Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory Construction* § 57:3, at 18 (7th ed. 2008).

---

1. The Board exercised authority over the Parks Division. *See* Ch. 245, sec. 2, § 33–10–104(1), 1984 Colo. Sess. Laws 881 ("The division shall be under the jurisdiction of the board.").

2. Ordinarily, words and phrases found in a statute are to be construed according to their familiar and generally accepted meaning. *See In re F.A.G.*, 148 P.3d 375, 377 (Colo.App.2006). In ordinary usage, the term "program" means "a proposed project or scheme." *Webster's Third New International Dictionary* 1812 (2002).

3. The park or regional manager's denial (but not grant) of a permit is subject to further review, but only by the Parks Division director.

¶ 81 "Whether a particular statute is mandatory or directory does not depend upon its form, but upon the intention of the Legislature, to be ascertained from a consideration of the entire act, its nature, its object, and the consequen[c]es that would result from construing it one way or the other." *In re McQuiston's Adoption,* 238 Pa. 304, 86 A. 205, 206 (1913) (internal quotation marks omitted); *see* Singer & Singer, § 57:2 (same).

¶ 82 Courts do not "follow a literal interpretation leading to an illogical or absurd result." *Garcia v. Medved Chevrolet, Inc.,* 240 P.3d 371, 374 (Colo.App.2009); *see Frazier v. People,* 90 P.3d 807, 811 (Colo.2004) ("A statutory interpretation leading to an illogical or absurd result will not be followed."); *In re N.B.,* 199 P.3d 16, 18 (Colo.App.2007) ("If the statutory language is clear, [courts] apply the plain and ordinary meaning, unless the result would be absurd or unreasonable.").

¶ 83 "Courts must read statutes with common sense in order to accomplish a reasonable result." Singer & Singer, § 57:3, at 19–21; *see In re City of Harrisburg,* 465 B.R. 744, 761 n.12 (Bkrtcy.M.D.Pa.2011) ("Common sense should be used when reading the statute to obtain the result intended."). "Legislative intent can ... be inferred on grounds of policy and reasonableness." Singer & Singer, § 57:3, at 31.

¶ 84 It is not, in my view, reasonable to interpret the special activities regulation in a manner that divests the Board of authority to determine whether, and, if so, how, a matter of the Project's magnitude and complexity could be conducted in the AHRA. The statutes governing the Board, Ch. 245, sec. 2, §§ 33–10–101 to –115, 1984 Colo. Sess. Laws 878–88, established it as the agency with ultimate responsibility and authority over the management of state parks and recreation areas and the development and implementation of park and outdoor recreation programs. Delegation to a park or regional manager of decisions whether to conduct routine, short-term events such as weddings, memorial services, family reunions, film shoots, bike races, fishing and boating competitions, and rescue trainings, makes sense; delegating to those individuals the responsibility for determining whether, and, if so, how, an activity of the Project's magnitude should be conducted does not. The latter-described responsibility appears to lie at the very core of the Board's statutory functions, and, in my view, it is highly unlikely that the Board intended, through the language it used in the special activities regulation, to divest itself totally of this responsibility.

¶ 85 Because I perceive that the majority's interpretation of the special activities regulation leads to an illogical or absurd result,[4] I do not join it. Instead, I would interpret the special activities regulation as requiring a project proponent to file a permit application to begin an approval process but not as establishing the mandatory or exclusive procedure for authorizing project activities at state parks or recreation areas.

¶ 86 I agree with the majority that

- substantial evidence supports the Board's decision to approve the Project; and,

- the Board did not err by conditioning its approval on the contents of a pending final Environmental Impact Statement.

¶ 87 In my view, the Board had the authority to approve the Project via a cooperative agreement, and the Board did not abuse its discretion in approving the Project in this manner. Consequently, I would affirm the Board's decision, albeit on grounds different from those upon which the majority relies.

---

4. At one point in its opinion, the majority states that "neither the Parks Division nor the Board ever concluded the regulation did not apply or that its application was absurd or illogical." The Board never contemplated, however, that the regulation would be applied to divest it of authority to act.